# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 06 2017, 8:14 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Charles W. Lahey
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Zachary Sanders, <br> *Appellant-Defendant,* <br><br> *v.* <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | July 6, 2017 <br><br> Court of Appeals Case No. 71A03-1611-CR-2556 <br><br> Appeal from the St. Joseph Superior Court <br><br> The Honorable Elizabeth C. Hurley, Judge <br><br> Trial Court Cause No. 71D08-1602-F2-1 |

**Bradford, Judge.**

# Case Summary

[1]     Taylor Roberts, Troy Mapes, Roberts's girlfriend Kiera Kurzhal-Geyer, and Tony Collado learned that Appellant-Defendant Zachary Sanders was interested in buying some illegal drugs and formulated a plan to rob Sanders. The quartet arranged to meet Sanders in a park, and did so. Collado and Mapes, who was armed with a handgun, got into Sanders's car and, instead of selling him drugs, robbed him. During the robbery, Mapes either showed the handgun to or pointed it at Sanders. Afterwards, as Collado and Mapes fled through a grassy area in the park, Sanders accelerated, ran over a traffic stop, pursued the duo, and eventually ran over Mapes before continuing out of the park. After Mapes died from his injuries, the State charged Sanders with Level 2 felony voluntary manslaughter. A jury convicted Sanders as charged, and the trial court sentenced him to twenty years of incarceration. Sanders argues that the State committed prosecutorial misconduct warranting reversal of his conviction, the trial court abused its discretion in admitting evidence that Sanders was attempting to illegally purchase drugs, and the trial court abused its discretion in instructing the jury on self-defense. We affirm.

# Facts and Procedural History

[2]     Roberts, Mapes, Kurzhal-Geyer, and Collado were together on February 19, 2016, when Mapes received a communication from Jesse Manczunski that

"somebody wanted some pills." Sept. 20, 2016, Tr. p. 130.[1] Manczunski had been in communication with Sanders and indicated to him that Mapes had some Klonopin for sale. The group, however, had no intention of selling Sanders any drugs; "the plan was to … take the money and run." Sept. 20, 2016, Tr. p. 130. After arrangements were made to meet Sanders at Merrifield Park in Mishawaka, Roberts, Mapes, Kurzhal-Geyer, and Collado drove there in Kurzhal-Geyer's car.

[3] Once the quartet arrived, Collado and Mapes—who was armed with a .22 caliber handgun—exited and walked across a field to meet Sanders. Collado sat in the front passenger seat of Sanders's vehicle while Mapes sat in the rear, driver's-side seat. Mapes pulled out the handgun, showed it to Sanders, and demanded money. Sanders refused and asked Mapes, "is it worth it[?]" Sept. 21, 2016, Tr. p. 15. Mapes and Sanders argued for a while, and, when Mapes asked Collado to take the keys to Sanders's vehicle, Sanders told him not to touch his car. Eventually, Mapes and Collado left the vehicle, having secured Sanders's money, and began running through a field in the park. As Mapes and Collado ran toward Kurzhal-Geyer's car, Sanders accelerated, drove over a concrete parking block, and pursued the duo. When Mapes slipped and went to

---

[1] Three days of Sanders's jury trial were transcribed, September 20, 21, and 22, 2016, each of which is covered by a separate transcript volume. Two tables of contents were submitted, one covering the transcripts from September 20 and 21 (designated "Volume 1 of 3") and the second covering September 22 (designated "Volume 1 of 2"). The transcript volume from September 20 is designated "Volume 2 of 3"; from September 21, "Volume 3 of 3"; and from September 22, "Volume 2 of 2[.]" In the interest of reducing possible confusion, we choose to refer to the various volumes by their dates.

one knee, Sanders ran over him with his vehicle and drove off. Mapes died of multiple blunt-force injuries, including a fractured skull, multiple rib fractures which caused lung lacerations, a heart contusion, a lacerated liver, and hemorrhaging around his kidneys. The next morning, Sanders sent a text message to Manczunski which stated, verbatim, that "I didn't get [the pills] he robbed me But it's aight[2] I ran him over when he was running away." State's Ex. 58.

[4] On February 22, 2016, the State charged Sanders with Level 2 felony voluntary manslaughter. On April 8, 2016, Deputy Prosecutor Joel Gabrielse sent a letter ("the Letter") to Roberts's attorney, offering a plea deal by which he would plead guilty to Level 3 felony armed robbery, with a sentence cap of six years in exchange for his cooperation in the trials of his codefendants. The Letter mentioned that the facts of the case could support charges of armed robbery, armed robbery resulting in serious bodily injury, and/or felony murder and also stated, "In the unfortunate event that [Roberts] decides to resolve this case by trial, it is anticipated that I will file and pursue some/all of the higher charges referred to in this letter." Appellant's App. Vol. II p. 101.

[5] The presentation of evidence in Sanders's jury trial began on September 20, 2016, and ended on September 22. On September 21, 2016, the prosecutor

---

[2] "Aight" is defined as a "nonstandard spelling of **all right**, representing a pronunciation[.]" OXFORD LIVING DICTIONARIES, NORTH AMERICAN ENGLISH, https://en.oxforddictionaries.com/definition/us/aight (last visited June 26, 2017) (bold in original).

brought copies of the Letter (and similar letters sent to Kurzhal-Geyer and Collado) to court, and the trial court indicated that it would allow Sanders to recall Roberts to the stand to address the Letter. According to Deputy Prosecutor Micah Cox, the Letter had not been previously disclosed because he was unaware of its existence. When Sanders's trial counsel asserted that the Letter did, in fact, exist, Deputy Cox discovered it "in the files" and that Deputy Gabrielse had sent it before leaving the Prosecutor's office. Sept. 21, 2016, Tr. p. 2. Sanders recalled Roberts as a witness and began, essentially, reading to him the portion of the Letter in which the deputy prosecutor mentioned the possibility of more serious charges should he reject the State's plea offer. The State objected on the grounds of hearsay and that the line of questioning was leading, but these objections were overruled.

[6] The jury found Sanders guilty as charged. On October 17, 2016, the trial court sentenced Sanders to twenty years of incarceration. Sanders contends that the State committed reversible prosecutorial misconduct, the trial court abused its discretion in admitting evidence that Sanders was attempting to illegally purchase drugs from Mapes, and the trial court abused its discretion in allowing the State to make improper arguments regarding Sanders's claim of self-defense.

# Discussion and Decision

## I. Prosecutorial Misconduct

[7] Sanders contends that the State committed prosecutorial misconduct such that reversal of his conviction is required.

> To support a motion for mistrial based upon prosecutorial misconduct, the defense must show that the prosecutor's actions constituted misconduct by reference to established norms of professional conduct, and that the ensuing prejudice placed him in a position of grave peril to which he should not have been subjected. *Maldonado v. State* (1976), 265 Ind. 492, 355 N.E.2d 843. Whether the misconduct results in grave peril is determined not by the degree of impropriety involved, but by its probable persuasive effect upon the jury. *Id.*; *Andrews v. State* (1989), Ind., 536 N.E.2d 507. This effect, in turn, is assessed not by whether its absence conclusively would lead to an acquittal; rather, reversal is required where the evidence is close and the trial court fails to alleviate the prejudicial effect. *Johnson v. State* (1983), Ind. App., 453 N.E.2d 365. Even where an isolated instance of misconduct does not establish grave peril, if repeated instances evidence a deliberate attempt to improperly prejudice the defendant, a reversal still may result. *Robinson v. State* (1973), 260 Ind. 517, 297 N.E.2d 409.

*Everroad v. State*, 571 N.E.2d 1240, 1244 (Ind. 1991).

## A. State's Objections to Evidence

[8] Sanders argues that the State engaged in a deliberate pattern of meritless objections in an attempt to disrupt his examination and cross-examination of witnesses. Sanders points to four instances of alleged disruptive objection: (1) the State objected on hearsay grounds during Sanders's cross-examination of Collado when Sanders was impeaching him using previous, inconsistent statements from a police report; (2) the State objected on hearsay grounds when Sanders attempted to elicit statements made by Mapes from Collado; (3) the State objected on speculation grounds to Sanders's question of Collado as to whether Mapes, Kurzhal-Geyer, or Roberts was unaware they were going to

participate in an armed robbery; and (4) the State objected on hearsay grounds to Sanders's reading of portions of the Letter to Roberts during Roberts's testimony.

[9] Sanders has failed to establish any prosecutorial misconduct in this regard. First and foremost, Sanders cannot show any prejudice, much less grave peril, because each of the State's objections mentioned above was, in fact, overruled; Sanders was therefore able to present his evidence as he wished. Second, suffice it to say that the State's objections, although overruled, were not frivolous. Finally, we have a difficult time imagining that four objections during a three-day trial with a transcript of approximately 500 pages—even if they *were* frivolous—could amount to reversible misconduct. Without significantly more justification than Sanders offers us here, we will not adopt a position that would create such an obvious disincentive to object during trial.

## B. *Brady* Violation

[10] Sanders contends that the State committed reversible prosecutorial misconduct by suppressing the Letter.

> In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). "To prevail on a *Brady* claim, a defendant must establish: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." *Minnick v.*

> *State*, 698 N.E.2d 745, 755 (Ind. 1998) (citing *Brady*, 373 U.S. at 87, 83 S. Ct. 1194), *cert. denied*, 528 U.S. 1006, 120 S. Ct. 501, 145 L. Ed. 2d 387 (1999). Evidence is material under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed.2d 481 (1985).

*Bunch v. State*, 964 N.E.2d 274, 297 (Ind. Ct. App. 2012). At the very least, Sanders's *Brady* claim fails because the Letter was disclosed before the end of his trial and Sanders did, in fact, use it to examine witnesses. *See U.S. v. Agurs*, 427 U.S. 97, 103 (1976) ("The rule of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215, arguably applies in three quite different situations. Each involves the discovery, *after trial* of information which had been known to the prosecution but unknown to the defense.") (emphasis added).

## C. Questions Regarding Sanders's Communications With Others

[11] Sanders contends that it was misconduct for the prosecutor to cross-examine him about statements he allegedly made to other persons regarding Mapes's death. Specifically, Sanders challenges the State's questions about whether he told (1) Manczunski in a text message that he ran Mapes over, (2) fellow inmate Troy Berg that he knew he was going to kill Mapes before he did, (3) Berg and fellow inmate Brian Collins that running over Mapes felt like a "human speed bump[,]" and (4) fellow inmate David Frowerk that running over Mapes "felt like running over someone in Grand Theft Auto, a video game[.]" Sept. 22,

2016, Tr. p. 50. Sanders responded that his text message to Manczunski was being taken out of context and denied making the other statements.

[12] When Sanders objected to the State's questioning, he indicated that he thought the jury should be instructed that the questions of counsel were not evidence. The trial court indicated that it would specifically instruct the jury at the conclusion of trial that "all of the counsel's questions are not evidence." Sept. 22, 2016, Tr. p. 50. Although the trial court's final jury instructions were not transcribed, Sanders does not claim that the instruction was not given, and more importantly, points to no indication that the jury did not follow the instruction. "'When the jury is properly instructed, we will presume they followed such instructions.'" *Weisheit v. State*, 26 N.E.3d 3, 20 (Ind. 2015) (quoting *Duncanson v. State*, 509 N.E.2d 182, 186 (Ind.1987)). In the absence of any indication that the jury ignored the trial court's instruction, Sanders has failed to establish prejudice in this regard.

[13] Moreover, even if we assume that the State improperly cross-examined Sanders and that the trial court improperly allowed it to, any such error can only be considered harmless. "Errors in the admission of evidence are to be disregarded as harmless unless they affect the substantial rights of the defendant." *Goudy v. State*, 689 N.E.2d 686, 694 (Ind. 1997). "[A]n error in the admission of evidence is harmless if the erroneously admitted evidence is cumulative of other evidence appropriately admitted." *Collins v. State*, 826 N.E.2d 671, 679 (Ind. Ct. App. 2005), *trans. denied*. As mentioned, Sanders sent the following text message to Manczunski: "I didn't get [the pills] he robbed

me  But it's aight I ran him over when he was running away." State's Ex. 58. This text message raises inferences that Sanders intentionally ran over Mapes and did not regret doing so. At best, any of the statements mentioned above[3] are merely cumulative of the text message, which was properly admitted. As such, any error that might have occurred can only be considered harmless.

## II. Evidence of Uncharged Attempts to Purchase Drugs

[14]    Sanders contends that the trial court abused its discretion in admitting Facebook communications between himself and Manczunski in the hours before and after Mapes's death. The admissibility of evidence is within the sound discretion of the trial court. *Curley v. State*, 777 N.E.2d 58, 60 (Ind. Ct. App. 2002), *trans denied*. We will reverse a trial court's decision on the admissibility of evidence only upon a showing of an abuse of that discretion. *Id*. An abuse of discretion may occur if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. *Id*. The Court of Appeals may affirm the trial court's ruling if it is sustainable on any legal basis in the record, even though it was not the reason enunciated by the trial court. *Moore v. State*, 839 N.E.2d 178, 182 (Ind. Ct. App. 2005), *trans. denied*. We do not reweigh the

---

[3] The State's questioning of Sanders, quite frankly, strongly implied that it had reason to believe that he made incriminating statements to Berg, Collins, and Frowerk, when there was no evidence to that effect, essentially, impeachment by innuendo. The record does not indicate why the State did not call Berg, Collins, or Frowerk to testify, but we remind the State that proper impeachment with a prior inconsistent statement requires that statement to be placed in evidence at some point.

evidence, and consider the evidence most favorable to the trial court's ruling. *Hirsey v. State*, 852 N.E.2d 1008, 1012 (Ind. Ct. App. 2006), *trans. denied*.

[15]     As we have explained,

> Indiana Evidence Rule 404(b) provides, in pertinent part, that:
>
> > Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident…
>
> This rule is "designed to prevent the jury from assessing a defendant's present guilt on the basis of his past propensities, the so-called 'forbidden inference.'" *Hicks. v. State,* 690 N.E.2d 215, 218-19 (Ind. 1997). Thus, in assessing the admissibility of evidence under Ind. Evidence Rule 404(b), the trial court must: (1) determine whether the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Evid. R. 403. *Id.* at 221. To determine whether the trial court abused its discretion, we employ the same test. *See, e.g., id.* at 221-23.

*Iqbal v. State*, 805 N.E.2d 401, 406 (Ind. Ct. App. 2004), *trans. denied*. The Indiana Supreme Court has stated that "[t]he paradigm of such inadmissible evidence is a crime committed on another day in another place, evidence whose only apparent purpose is to prove the defendant is a person who commits crimes." *Swanson v. State*, 666 N.E.2d 397, 398 (Ind. 1996).

[16] The evidence of Sanders attempting to arrange the illegal purchase of drugs with Manczunski is not the sort of evidence the *Swanson* court had in mind. The messages at issue began a few hours before Mapes's death, continued for a few hours afterwards, and shed light on how Sanders came to interact with Mapes, as well as Sanders's mindset before and after Mapes's death. In a message sent at 4:05 p.m. on February 19, 2016, Sanders wrote, "Yeah I have no one for [Klonopins] either  What could you get us for 60$  And do you have anything left I took my last dose haha[.]" State's Ex. 47. At 5:30 p.m. Sanders wrote, "Can you find anything I have no doses left[.]" State's Ex. 49. At 5:39 p.m., Sanders wrote, If it doesn't get here tomorrow we could be really f*****[.]" State's Ex. 50. The next morning at 5:25 a.m., Sanders wrote, "I didn't get [the pills] he robbed me  But it's aight I ran him over when he was running away." State's Ex. 58. The messages sent before Mapes's death indicate a certain level of desperation on Sanders's part to secure drugs, a desperation that could certainly provide a motive for his reaction when, instead of getting his drugs, he was robbed at gunpoint. The message sent the next morning, while mentioning what could be inferred as an illegal drug deal, is also extremely relevant evidence of Sanders's state of mind and motive for running Mapes down.

[17] On the whole, we conclude that the evidence of Sanders's communications with Manczunski is relevant to issues beyond Sanders's propensity to commit crimes, specifically, why Sanders would have wanted to kill Mapes. We agree with the trial court's assessment that the evidence is relevant to show the

absence of mistake, at the very least. We further conclude that the probative value of the evidence outweighed the risk of any unfair prejudice that might have resulted. After all, Sanders admitted in his own testimony that he was attempting to illegally purchase antianxiety medication the evening of February 19, 2016. Moreover, we consider it unlikely that a jury would convict a person of voluntary manslaughter solely on the basis that he also attempted to illegally purchase drugs. Sanders has failed to establish that the trial court abused its discretion in admitting evidence of his communications with Manczunski.

## III. Self-Defense

[18] Finally, Sanders argues that the trial court abused its discretion in instructing the jury on self-defense and that the jury's determination that he did not act in self-defense is unreasonable. The record indicates that the trial court gave the following final instruction on self-defense:

> It is an issue whether the Defendant acted in self-defense.
>
> A person may use reasonable force against another person to protect himself from what he from what the Defendant [sic] reasonably believes to be the imminent use of unlawful force.
>
> A person is justified in using deadly force, and does not have a duty to retreat, only if he reasonably believes that deadly force is necessary to prevent serious bodily injury to himself.
>
> However, a person may not use force if:
>
> he is committing a crime that is directly and immediately connected to the confrontation
>
> or

he is escaping after the commission of a crime that is directly and immediately connected to the confrontation

or

he provokes a fight with another person with intent to cause bodily injury to that person

or

he has willingly entered into a fight with another person or started the fight, unless he withdraws from the fight and communicates to the other person his intent to withdraw and the other person nevertheless continues or threatens to continue the fight

The State has the burden of proving beyond a reasonable doubt that the Defendant did not act in self-defense.

Appellant's App. Vol. II p. 90.

## A. Propriety of Instruction

[19] The manner of instructing a jury lies largely within the discretion of the trial court, and we will reverse only for an abuse of discretion. *Henson v. State*, 786 N.E.2d 274, 277 (Ind. 2003). "'In determining whether a trial court abused its discretion by declining to give a tendered instruction, we consider the following: (1) whether the tendered instruction correctly states the law; (2) whether there was evidence presented at trial to support giving the instruction; and (3) whether the substance of the instruction was covered by other instructions that were given.'" *Id.* (quoting *Lampkins v. State*, 778 N.E.2d 1248, 1253 (Ind. 2002)). As the State notes, while Sanders seems to argue that the trial court abused its discretion in giving the above instruction, he appears to concede that it is a correct statement of the law, and it does, in fact, closely track the

language of the applicable statute. *See* Ind. Code § 35-41-3-2; *see also, e.g.*, *Mayes v. State*, 744 N.E.2d 390, 392 (Ind. 2001). Sanders has failed to establish that the trial court abused its discretion in this regard.

## B. Failure to Find Sanders Acted in Self-Defense

[20] Sanders argues, however, that given the facts of this case, there is no nexus between the attempt to illegally purchase drugs and the charged conduct. As the State correctly notes, this was a question of fact for the jury, *i.e.*, "it is within the province of the jury to determine whether the defendant's evidence was believable, unbelievable, or sufficient to warrant the use of force." *Ault v. State*, 950 N.E.2d 326, 328 (Ind. Ct. App. 2011), *trans. denied*. The State introduced evidence sufficient to support a finding that whatever need Sanders might have had to defend himself was a result of his attempt to illegally purchase drugs.

[21] The judgment of the trial court is affirmed.

Mathias, J., and Altice, J., concur.