FILED

Aug 01 2018, 5:25 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

G. Allen Lidy
Lidy Law, PC
Mooresville, Indiana

John V. Siskopoulos
Siskopoulos Law Firm, LLP
Boston, Massachusetts

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Laura R. Anderson
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jeffrey Fairbanks,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

August 1, 2018

Court of Appeals Case No.
49A02-1707-CR-1675

Appeal from the Marion Superior
Court

The Honorable Sheila A. Carlisle,
Judge

Trial Court Cause No.
49G03-1508-MR-30525

**Vaidik, Chief Judge.**

# Case Summary

[1] In May 2015, Jeffrey Fairbanks admitted to police that he disposed of his three-month-old daughter's body in an Indianapolis dumpster. Despite extensive

search efforts, her body was never found. The State charged Fairbanks with murder and Level 1 felony neglect of a dependent resulting in death. At trial, the State, in order to prove that Janna's death was not an accident, presented evidence that Fairbanks had placed a pillow on his daughter on at least four prior occasions. The jury found Fairbanks not guilty of the murder charge but guilty of the neglect charge.

[2] Fairbanks now appeals arguing, among other things, that the evidence that he had previously placed a pillow on his daughter was inadmissible pursuant to Indiana Evidence Rule 404(b)'s lack-of-accident purpose because he never claimed that his daughter's death was an accident.

[3] Because accident is a subset of intent—that is, a defendant who claims accident is necessarily claiming that the act was not intentional—we conclude that, similar to intent, defendants must affirmatively claim accident before the State can admit evidence pursuant to Evidence Rule 404(b) that the act was not an accident. However, because we find that Fairbanks claimed accident at trial and that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice, we conclude that the trial court properly admitted the pillow evidence. Finding no merit to the other arguments that Fairbanks raises on appeal, we affirm his conviction for Level 1 felony neglect of a dependent resulting in death.

# Facts and Procedural History

[4] Yolanda Rivera and Fairbanks were the parents of Janna, who was born in February 2015. Yolanda, Fairbanks, Janna, and Yolanda's two other daughters—thirteen-year-old A.G. and eleven-year-old E.M.—lived at Maison Gardens, an apartment complex at 42nd Street and Post Road in Indianapolis. In May 2015, they moved to a nearby house on Candy Apple Boulevard. Yolanda, Fairbanks, and Janna slept in the same bedroom, sharing a king bed.

[5] On Thursday, May 28, Yolanda woke up around 3:30 a.m. to get ready for work. Yolanda changed three-month-old Janna's diaper (Janna did not wake up during the diaper change) and went to the kitchen to prepare a bottle for her.[1] Yolanda then left Janna's bottle on the bed for when she woke up. When Yolanda left the house around 4:15 a.m., she told Fairbanks that she had left a bottle ready for Janna. Yolanda also left her cell phone for Fairbanks because he had lost his cell phone.

[6] Fairbanks had an appointment that morning, so A.G. and E.M. had planned to stay home from school that day to watch Janna. However, Fairbanks's appointment was canceled. Around 8:00 a.m., Fairbanks woke up A.G. to let her know that he would be home after all. A.G. heard Janna crying around that time; she described Janna's crying like "a regular baby would cry." Tr.

---

[1] Citing page 44 of the transcript (Vol. III), Fairbanks claims that Yolanda testified that it was a "highly unusual event" for Janna not to wake up during her diaper change. Appellant's Br. p. 7. Yolanda, however, did not testify to this.

Vol. III p. 166. A.G. went back to sleep and woke up for good around 11:00 a.m. She again heard Janna crying, but this time—unlike the crying she had heard around 8:00 a.m.—the crying sounded "muffled." *Id.* at 164. A.G. went downstairs, ate breakfast, and watched television with E.M., who had already woken up and gone downstairs. About twenty minutes later, A.G. went upstairs to use the bathroom, at which point she heard Janna's "muffled" crying again. *Id.* at 166. After using the bathroom, A.G. went back downstairs.

[7] A little later, Fairbanks came downstairs, went into the kitchen, and asked the girls if there were any trash bags in the house. A.G. said she didn't know. After looking around, Fairbanks went back upstairs for about five minutes and then came back downstairs with Janna, telling E.M. that he was going for a ride. Janna was wrapped in a blanket with only her nose and eyes showing. Janna's eyes were closed, and she was not moving or making any sounds. Fairbanks took Janna to his car, but he did not use the car seat, which was still in the house.

[8] In the meantime, Yolanda had been calling Fairbanks several times throughout the day using a co-worker's cell phone, but Fairbanks never answered. When Yolanda got off work at 1:30 p.m., she went straight home, arriving about twenty minutes after Fairbanks had left with Janna. *See id.* at 49 (Yolanda testifying that she got home "[a]round 2:00" p.m.). Yolanda was "alarmed" because Janna's car seat was at home, and Fairbanks had not taken any diapers or milk for Janna. *Id.* at 48-49, 171. Yolanda called Fairbanks several more times, but he still did not answer. Yolanda went to Maison Gardens (they still

had keys to their old apartment), but he wasn't there either. Yolanda went back home and waited.

[9] Fairbanks finally returned home around 11:30 p.m. Yolanda and her daughters met him at his car. Yolanda asked Fairbanks where Janna was, and he said Janna was in the car. But when Yolanda looked in the car she only found a box of black trash bags. Yolanda thought this was "strange" because they did not use black trash bags at their house. *Id.* at 54. Yolanda and her daughters followed Fairbanks inside their house, where Yolanda continued to ask him where Janna was. Fairbanks finally said he had buried Janna in a cornfield and left a cross, but he would not tell them where. As they continued asking him more questions about Janna, Fairbanks's only answer was that she was "in a better place now." *Id.* at 174.

[10] Yolanda did not call 911 that night because she was scared of Fairbanks. *Id.* at 57, 63 (Fairbanks threatening Yolanda: "Call the police, and you'll see what happens."); *see also* Tr. Vol. IV p. 88 (E.M. testifying that Fairbanks was "mad" about the possibility of police being called that night). Yolanda, however, called 911 the following morning, Friday, May 29, when she left the house to take A.G. and E.M. to school. Indianapolis Metropolitan Police Department officers were dispatched to Candy Apple a little before 9:00 a.m. Upon arrival, officers woke up Fairbanks and asked him—about "20 times"—where Janna was. Tr. Vol. III p. 27. Each time Fairbanks responded that he "didn't know." *Id.* at 27, 95. According to the officers, Fairbanks's demeanor was "annoyingly

calm and monotone." *Id.* at 95. Officers immediately began searching for Janna in the neighborhood retention pond and nearby woods.

[11] Meanwhile, Fairbanks was taken to the police station, where he was interviewed that afternoon by a homicide detective and a missing-persons detective. For over an hour, Fairbanks, who appeared "nonplussed about the whole situation," maintained that he didn't know where Janna was. Tr. Vol. IV p. 15. Fairbanks claimed that he "never hurt [his] baby." Exs. 25 & 25A. The officers then employed a "minimization" technique, whereby they suggested that Janna died from SIDS or from Fairbanks accidentally rolling onto her while he was sleeping. Tr. Vol. IV pp. 20-21. Eventually, Fairbanks admitted that when he woke up, Janna was "already gone," that he didn't know what happened to her, and that he didn't do anything wrong. Exs. 25 & 25A. He said he then "panicked" and drove around with her body for eight hours. *Id.* After this admission, around 5:30 p.m., the officers and Fairbanks got into a patrol car, and Fairbanks directed them to a dumpster at Maison Gardens, which is where he claimed to have discarded Janna's body. The officers searched the dumpster, but it had recently been emptied. The officers learned that the dumpster contents could have been taken to three possible landfills, and those landfills were extensively searched by officers from several different agencies over the next several days. Janna's body was never found. However, Janna's blanket—the one she was wrapped in when Fairbanks left the house with her on Thursday afternoon—was found.

[12] In any event, after the dumpster was searched that Friday evening, the officers and Fairbanks returned to the police station to resume the interview. *See* Exs. 26 & 26A. Fairbanks told the officers that Janna woke up around 5:30 a.m., at which point he changed her diaper. Fairbanks said when he changed Janna's diaper, he placed a pillow over her face to "muffle her" because she was crying; however, he claimed that he took the pillow off "right away" and then fed her. *Id.* The officers gave Fairbanks a doll to demonstrate how he placed the pillow on Janna. Fairbanks said after feeding her, he and Janna stayed up for about two-and-a-half hours before going back to sleep. *Id.* Fairbanks said when he woke up and realized that Janna was dead, he panicked and tried to figure out what happened: "So when I was panicking I was trying to figure out what happened. You know, that's the only thing I could think of is I rolled over on her, but when I woke up it . . . didn't look like that [because Janna was in the middle of the king bed and I was on the edge]." *Id.* When the interview was over, Fairbanks was free to leave.

[13] During the following weeks, Fairbanks gave interviews to two Indianapolis television stations, WTHR and Fox 59. *See* Exs. 56 & 57. During these interviews, Fairbanks said Janna woke up around 5:30 a.m., at which point he changed her, he gave her a bottle, and she went back to sleep. Fairbanks said he stayed up until around 8:00 a.m.; he then went back to sleep and did not wake up again until around 1:30 p.m. When Fairbanks picked up Janna, he said she was limp and lifeless, her lips were blue, and he couldn't figure out why. He said he tried to give Janna CPR, but he was unable to revive her. He

said he took Janna's body out of the house because he didn't want Yolanda or the girls to see her that way. When asked if he accidentally rolled over Janna when he was sleeping, he said he didn't think so but he didn't know. Ex. 57 (6:07). Fairbanks admitted telling Yolanda that he buried Janna's body when he really discarded her body in a dumpster.

[14] On August 27, 2015—nearly three months after Janna's death—the State charged Fairbanks with Count I: murder and Count II: Level 1 felony neglect of a dependent resulting in death. The charging information for Count I alleged that Fairbanks knowingly killed Janna. The charging information for Count II alleged that Fairbanks, who was at least eighteen years old, knowingly placed Janna, a dependent who was less than fourteen years old, in a situation that endangered her life or health, to wit: he placed and/or left Janna in an unsafe and/or unsupervised environment, which resulted in her death. Appellant's App. Vol. II p. 17.

[15] Before trial, the State filed a notice of intent to admit 404(b) evidence that Fairbanks had "plac[ed] a pillow over [Janna's] face on at least (2) [prior] occasions." *Id.* at 88. The evidence that the State wanted to admit was statements from A.G. and E.M. Fairbanks filed a motion in limine seeking to prohibit the State from introducing such evidence, claiming that it violated Indiana Evidence Rules 404(b) and 403. *Id.* at 83. A hearing was held, and the State argued that the pillow evidence was admissible under Evidence Rule 404(b):

[I]n our particular case, the defendant has stated that he didn't know how the baby died, the baby died, he got up, he put her in his car, he drove around, and he eventually put it in a dumpster, so that negates – that states that it's an accident. And he's – I mean, he's implying through his actions that it was an accident. He didn't – you know, he denied killing the child in his statement.

So I need to be able to combat that.

* * * * *

I can't prove the exact cause of death because he's destroyed the best piece of evidence, and that is the body. And . . . that's not at argument here. He readily admitted over and over and over that he put the body in the dumpster.

* * * * *

So the only way I can get to trying to prove his mistake or his accident is to show his actions and his relationship with this infant. And so that's why the State would object . . . to these actions being limined.

Tr. Vol. II pp. 30-31. Defense counsel responded that A.G.'s and E.M.'s statements regarding the prior pillow incidents were "not reliable" and "highly prejudicial." *Id.* at 40. The trial court took the matter under advisement and later denied Fairbanks's motion in limine on this issue.

[16]   A jury trial was held in April 2017.  Right before trial started, and as the jury was about to enter the courtroom, the trial court went over last-minute issues with the attorneys.  Defense counsel stated:

> Judge, we would like to show a . . . continuing objection to the pillow evidence that the Court denied in . . . the Motion in Limine.  I can object, obviously, at the time, but just wanted to show a continuing objection to that evidence.

Tr. Vol. III p. 3.  The court responded, "Okay.  Anything in response?"  *Id.* The only response the State had was to offer a stipulation on another matter. As the State was discussing the stipulation, the jury entered the courtroom.

[17]   During trial, Yolanda testified that she had a normal pregnancy and that Janna was a "healthy baby."  *Id.* at 36.  Likewise, a pediatrician testified that Janna was seen at her ten-day and one-month check-ups and that she was generally healthy (Janna was not taken to her two-month check-up; her next check-up would have been her four-month check-up).[2]

[18]   A.G. and E.M. then testified about the prior pillow incidents; however, defense counsel did not object during their testimony.  Specifically, A.G. testified that she had seen Fairbanks put a pillow on Janna "two or three times," including

---

[2] The pediatrician testified that Janna had subconjunctival hemorrhages at her one-month checkup. According to the pediatrician, they are "small red spots in the white part of the eye that are kind of near the iris—they're generally not very big—little red spots that indicate[] burst capillaries in the eyes."  Tr. Vol. III p. 232.  They are caused by "[a]nything that causes increased pressure in the head," such as "hitting the eye with something, or coughing very vigorously, or vomiting, or crying very vigorously."  *Id.* at 233.

once at Candy Apple. *Id.* at 178, 180. A.G. said Fairbanks put "a big long bed pillow" with a red fluffy cover over Janna's head because she was "fussy" and "crying." *Id.* at 180. Janna was in the middle of the bed at the time. A.G. explained that when she tried to remove the pillow, Fairbanks got angry and told her that she didn't know what she was doing. Fairbanks then told A.G. that the pillow would stop Janna from crying and would relax her and put her to sleep. A.G. explained that the muffled crying she heard on Thursday, May 28 was the same crying that she heard when Janna had a pillow over her face on the previous occasions. *Id.* at 219-20.

[19]    E.M. also testified about seeing a pillow on Janna's face on two occasions.[3] She said when Janna was about two months old and they lived at Maison Gardens, she came home from school one day and saw Janna lying on the bed with a red and white bed pillow on her face. When she took the pillow off Janna, Janna was hot and crying. E.M. went into the living room and asked Fairbanks why there was a pillow on Janna's face. Fairbanks responded that "maybe" Janna put it on her face. Tr. Vol. IV p. 91. E.M. then gave Janna a bath because she was sweaty. E.M. said she saw Janna with a pillow on her face one other time as well. *Id.* at 92. Defense counsel vigorously cross-examined A.G. and E.M., including why they did not initially tell police or the forensic interviewer about the muffled cries or the prior pillow incidents.

---

[3] Although it's not entirely clear from the girls' testimony, it appears that they testified to separate incidents of seeing a pillow on Janna's face.

Fairbanks did not ask for, and the court did not give, a limiting instruction to the jury about the prior pillow incidents.

[20] During closing argument, the State argued that the evidence supported guilty verdicts for each charge:

> Fairbanks is guilty of murder. He smothered Janna with a pillow. He caused her to suffocate and die. And so that means . . . the State of Indiana has met its burden. We have met [our] burden by proving Jeffrey Fairbanks knowingly killed Janna . . . .
>
> In reference to the neglect, we've proven that the defendant is Jeffrey. We've proven the fact that he is over 18 years of age. [We've] proven that he had the care and control of his own daughter, his own three-month-old baby.
>
> We've proven that Janna was a . . . dependent. She was less than 14 years of age, [she was] 3 1/2 months.
>
> He did place her in a situation that endangered her life. By placing a pillow over her head, it would be hard to say that that wasn't an unsafe environment. And then he went back to sleep, left her there. Left her like that.
>
> He left her unsupervised because he was sleepy, and it resulted in Janna's death. He just wanted to shut her up.
>
> Any parent . . . would know not to put a pillow over a . . . three-month-old baby's head.

Tr. Vol. V pp. 31-32. Defense counsel argued that the State didn't meet its burden of proof for either charge:

Charging instrument—they have to prove that he knowingly killed the child. That's murder. Murder.

He didn't murder this child. He loved this child. He didn't neglect this child, right?

They charged unsafe or unsupervised, right? She wasn't unsupervised. He was in the bed.

Now, they might get up and say well, . . . he'd sleep . . . through her. Well, okay. I find that interesting because if that's the case, if you could never go to sleep as a parent, right, for fear that you would unsupervise your child, then none of us would ever sleep; right?

She was supervised. He was in the same room; right?

Was it unsafe? People sleep with their kids all the time. This is accidental. It's an accident compounded by his stupidity of what he did with his own daughter (indicating). And . . . we have owned that; right? We told you we would own it.

* * * * *

Their theory of it's Jeffrey's fault because we don't have a body cuts both ways. Ladies and Gentlemen, they have not proven this case beyond all reasonable doubt. They haven't given you a reason to convict Mr. Fairbanks, and you must find him not guilty on both charges (indicating).

*Id.* at 71-73.

The jury found Fairbanks not guilty of murder but guilty of Level 1 felony neglect of a dependent resulting in death. The trial court sentenced Fairbanks to the advisory term of thirty years.

Fairbanks now appeals.[4]

# Discussion and Decision

Fairbanks raises several issues on appeal, which we restate as follows. First, Fairbanks contends that the evidence that he had previously placed a pillow over Janna's face was inadmissible pursuant to Evidence Rule 404(b). Second, he contends that the prosecutor committed misconduct by presenting more than one theory to prove the neglect-of-a-dependent charge at trial. Third, he contends that juror misconduct occurred during trial when a juror used her phone to research police investigations and credibility, warranting a new trial. Finally, he contends that the neglect-of-a-dependent statute is void for vagueness.

# I. Evidence Rule 404(b)

The State argues that Fairbanks has not preserved the issue of whether the evidence that he had previously placed a pillow over Janna's face was inadmissible pursuant to Evidence Rule 404(b) because defense counsel did not

---

[4] We held oral argument in this case on July 9, 2018. We thank counsel for their presentations.

object when A.G. and E.M. testified at trial about the incidents. Right before trial started, and as the jury was about ready to enter the courtroom, defense counsel told the trial court that he would like to show a continuing objection to the pillow evidence. The State claims this wasn't good enough because the court "never granted such request." Appellee's Br. pp. 20-21. This Court addressed the proper procedure for using continuing objections in *Hayworth v. State*, 904 N.E.2d 684 (Ind. Ct. App. 2009). We cautioned that if "the trial court does not specifically grant the right to a continuing objection, it is counsel's duty to object to the evidence as it is offered in order to preserve the issue for appeal." *Id.* at 692. Here, when defense counsel said he would like to show a continuing objection to the pillow evidence, the trial court said, "Okay," and asked the State if it had a response. Tr. Vol. III p. 3. The State's only response was to offer a stipulation on another matter. As the State was discussing the stipulation, the jury entered the courtroom. We find that the trial court's response was sufficient to preserve this issue for appeal.

[25] Proceeding to the merits, Evidence Rule 404(b) provides that evidence of a crime, wrong, or other act "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but it "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of

mistake, or lack of accident."[5]  Evidence Rule 403 provides, in turn, that evidence, even if relevant, should be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."  Therefore, when the State seeks to use evidence of a crime, wrong, or other act, the court must (1) determine whether the evidence is relevant to a matter at issue other than the defendant's propensity to commit the charged act and, if so, (2) balance the probative value of the evidence against its prejudicial effect.  *Hicks v. State,* 690 N.E.2d 215, 221 (Ind. 1997).  We review a trial court's ruling for an abuse of discretion.  *Spencer v. State*, 703 N.E.2d 1053, 1057 (Ind. 1999).

[26]  At trial, the State sought to use evidence of the prior pillow incidents to prove that Janna's death was **not** an accident.  But Fairbanks highlights that he has never claimed that Janna's death was an accident; rather, he has consistently maintained that he doesn't know how she died.  *See* Tr. Vol. V pp. 82-83 (State acknowledging during closing argument that Fairbanks never said how Janna died).  Fairbanks argues that evidence of a crime, wrong, or other act is admissible to prove lack of accident **only if the defendant first claims accident**.  The State responds that "[c]ontrary to [Fairbanks's] argument, a defendant does not need to affirmatively advance a contrary claim of accident prior to the

---

[5] Evidence Rule 404(b) previously referenced "absence of mistake or accident."  The rule was amended effective January 1, 2014, to separately reference "absence of mistake, or lack of accident."

State's introduction of prior bad act evidence." Appellee's Br. p. 21. The State asserts that "lack of accident" is **not** like "intent," which is only available when a defendant goes beyond merely denying the charged culpability and affirmatively presents a claim of particular contrary intent. *See Wickizer v. State*, 626 N.E.2d 795, 799 (Ind. 1993).

[27] An accused can be said to have raised a claim of particular contrary intent through pretrial statements to police, opening statement, cross-examination of the State's witnesses, or evidence in the defendant's case in chief. *Lafayette v. State*, 917 N.E.2d 660, 663 (Ind. 2009); 12 Robert L. Miller, Indiana Practice, *Indiana Evidence*, § 404.214 (4th ed. 2016). Absence of mistake and lack of accident have been described as a more specialized application of the broader category of intent. *See* 22B Charles Alan Wright, *Federal Practice and Procedure*, § 5255 (2d ed. 2014); *see also Wages v. State*, 863 N.E.2d 408, 412 (Ind. Ct. App. 2007) (explaining that absence of mistake and lack of accident have been described as "simply a special form of the exception that permits the use of other crimes to prove intent" (quotations omitted)), *reh'g denied*, *trans. denied*. Although the Indiana Supreme Court has held that the concerns that led them in *Wickizer* to adopt a narrow construction of the intent purpose do not apply to all of the 404(b) purposes, *Hicks*, 690 N.E.2d at 222 n.12; *Goodner v. State*, 685 N.E.2d 1058, 1061 (Ind. 1997), the Court "has not stated definitively whether [this] approach applies when the prosecution seeks to offer extrinsic act evidence to prove an intermediate inference (**such as . . . absence of mistake or**

**accident**) leading to an ultimate inference of intent," 12 Miller, § 404.214 (emphasis added).

[28]     In short, there is no clear-cut answer under Indiana law whether a defendant must affirmatively claim mistake or accident before the State can admit evidence pursuant to Evidence Rule 404(b) that the act was not a mistake or accident. This Court recognized as much in *Wages*: "It is unclear whether, under the 'absence of mistake or accident' prong of Rule 404(b), the defendant must first affirmatively claim that he or she did something mistakenly or accidentally before the State can invoke that prong to introduce evidence of other wrongs." 863 N.E.2d at 412 n.3 (citing *McCloud v. State*, 697 N.E.2d 96 (Ind. Ct. App. 1998)). According to the Indiana Practice, the absence-of-mistake and lack-of-accident purposes apply "most frequently when **the defendant asserts** a set of facts explaining the charged conduct as accidental or based on a mistake." 12 Miller, § 404.229 (emphasis added). Indeed, a survey of the cases where evidence has been admitted pursuant to Evidence Rule 404(b)'s absence-of-mistake and lack-of-accident purposes reveals that, in the vast majority of the cases, the defendant has affirmatively claimed that the act was a mistake or accident. *See Scalissi v. State*, 759 N.E.2d 618, 623 (Ind. 2001) (holding that evidence that the defendant had raped the victim's companion was admissible under lack of accident to rebut the defendant's claim that he accidentally shot the victim); *Clemens v. State*, 610 N.E.2d 236, 242 (Ind. 1993) ("The purpose specified above, to show the absence of mistake or accident, seems tailor-made to allow the admission of evidence of [the defendant's] abuse

of Jordan to rebut his claim that accidental injuries were the cause of the other twin's death."), *reh'g denied*; *Iqbal v. State*, 805 N.E.2d 401, 408 (Ind. Ct. App. 2004) (holding that evidence of the defendant's violence toward the victim was admissible under lack of accident to combat the defendant's claim that "[t]he gun went off by itself"); *Craun v. State*, 762 N.E.2d 230, 237 (Ind. Ct. App. 2002) (holding that evidence that the defendant had allegedly molested other girls was not admissible under lack of accident because the defendant "never stated that he touched [the victim's] vagina, either accidentally or intentionally"), *trans. denied*; *Brown v. State*, 684 N.E.2d 529, 535-36 (Ind. Ct. App. 1997) (holding that other incidents of ghost employment were admissible under lack of accident to rebut the defendant's claim that his conduct was the result of youth and inexperience), *trans. denied*; *Brown v. State*, 659 N.E.2d 652, 655-56 (Ind. Ct. App. 1995) (holding that evidence that the defendant had previously battered the victim was admissible under lack of accident to combat the defendant's claim that the shooting was "an accident"), *trans. denied*; *but see Nicholson v. State*, 963 N.E.2d 1096, 1100 (Ind. 2012) (holding that the defendant's 2006 voyeurism conviction involving the victims was admissible in his newest trial involving the same victims in order to prove "absence of mistake" because it showed that he knew "the exact home he was targeting [and] . . . that he was not dialing a random number but the same phone number he dialed in 2006" even though it does not appear from the opinion that defendant made such claims at trial). Indeed, the State conceded at oral argument that it had not found a case where the State admitted evidence under Evidence Rule 404(b) that the act was not a mistake or accident when the

defendant had **not** made such a claim.[6]  Oral Arg. Video at 34:00.  We thus find that accident and mistake are a subset of intent, in that a defendant who claims mistake or accident is necessarily claiming that the act was not intentional. Accordingly, we conclude that, similar to intent, defendants must affirmatively claim mistake or accident before the State can admit evidence pursuant to Evidence Rule 404(b) that the act was not a mistake or accident.

[29]     As for whether Fairbanks affirmatively claimed accident during his pretrial statements to police, opening statement, cross-examination of the State's witnesses, or evidence in the defendant's case in chief, we note that Fairbanks got very close to the line several times when he said he didn't know what happened to Janna and that he didn't do anything wrong.  Fairbanks told police during his interview that when he realized that Janna was dead, he panicked and tried to think through what could have happened.  He then explained that the "only" thing he could think of was that he "rolled over on her," but it didn't look like he did given their positions in the bed when he woke up.  The State argues that Fairbanks then crossed that line during his WTHR interview, which was admitted into evidence at trial.  *See* Oral Arg. Video at 35:30.  During that interview, Fairbanks was asked why he discarded his daughter's body in the dumpster.  Fairbanks responded that "you never know what you are going to do when you are faced with the loss of a loved one that's that close to you."

---

[6] We disagree with the State's argument that *Stettler v. State*, 70 N.E.3d 874 (Ind. Ct. App. 2017), *trans. denied*, stands for the proposition that a defendant does not need to affirmatively claim mistake or accident before the State can admit evidence that the act was not a mistake or accident.

Ex. 56 (8:09). Fairbanks said he might have reacted differently if he "had known why" Janna died. *Id.* (8:18). He then explained that at that point in time, he really didn't know much about "SIDS," "roll-over deaths," and "all the things that can happen." *Id.* (8:23).

[30] In addition, defense counsel cross-examined the pediatrician about the dangers of co-sleeping. The pediatrician testified that it was important not to co-sleep because "someone could roll on the baby, or they could accidentally get smothered against someone at night." Tr. Vol. IV p. 5. When asked if she was aware that Janna was co-sleeping with her parents, the pediatrician said no and highlighted that Yolanda had told the medical assistant at both of Janna's appointments that Janna slept in her own bed. While this is not overwhelming evidence that Fairbanks affirmatively claimed accident, it is sufficient. If there was any doubt whether Fairbanks claimed accident during trial, that doubt was extinguished when defense counsel argued during closing that what happened to Janna was, in fact, an "accident." In particular, defense counsel argued: "Was it unsafe? People sleep with their kids all the time. This is accidental. It's an accident compounded by [Fairbanks's] stupidity [of discarding Janna's body in a dumpster]." Tr. Vol. V p. 72.

[31] The prejudicial effect of the pillow evidence does not substantially outweigh its probative value. *See Hicks*, 690 N.E.2d at 221, 223. This is so because Fairbanks himself admitted putting a pillow (albeit briefly) on Janna to muffle her on the day that she died. In addition, the prior pillow incidents that the girls testified about did not result in physical harm to Janna, as the pillow was

removed. Accordingly, we find that the pillow evidence was admissible under Evidence Rule 404(b)'s lack-of-accident purpose.

[32] But even if we found that the pillow evidence was not admissible under Evidence Rule 404(b)'s lack-of-accident purpose and that the trial court therefore erred by admitting it, the error was harmless. An error is harmless when it results in no prejudice to the "substantial rights" of a party. *Durden v. State*, 99 N.E.3d 645, 652 (Ind. 2018). The basic premise of the harmless-error rule "holds that a conviction may stand when the error had no bearing on the outcome of the case." *Id.* To determine whether an error in the introduction of evidence affected the defendant's substantial rights, we assess the probable impact of that evidence upon the jury considering all the other evidence that was properly presented. *Blount v. State*, 22 N.E.3d 559, 564 (Ind. 2014). If we are satisfied that the conviction is supported by independent evidence of guilt such that there is no substantial likelihood that the challenged evidence contributed to the verdict, the error is harmless. *Id.*

[33] Here, there is substantial independent evidence that Fairbanks knowingly placed Janna in a situation that endangered her life or health (by placing and/or leaving Janna in an unsafe and/or unsupervised environment), resulting in her death. Appellant's App. Vol. II p. 17. Fairbanks was alone with Janna in the bedroom from 4:15 a.m. to 1:30 p.m. Fairbanks admitted putting a pillow on

Janna while he changed her diaper because she was crying.[7]  When Fairbanks briefly woke up A.G. around 8 a.m. to tell her that he would be home that day after all, A.G. heard Janna's regular cries.  Fairbanks then went back to sleep (sharing a bed with Janna) and didn't wake up again until 1:30 p.m.  When A.G. woke up for good around 11 a.m. (which is when Fairbanks claimed to have been sleeping), she heard Janna's muffled cries.  About twenty minutes later, A.G. heard Janna's muffled cries again when she went upstairs to use the bathroom.  When Fairbanks woke up at 1:30 p.m., Janna was limp and lifeless and her lips were blue.  Fairbanks drove around with Janna's body for several hours and eventually discarded her body in a dumpster.  Throughout the day, Fairbanks avoided Yolanda's phone calls, and when he finally returned home around 11:30 p.m., he told Yolanda and the girls that he had buried Janna's body in a cornfield (but he wouldn't tell them where).  Notably, Fairbanks did not want police called that night and threatened Yolanda.  When police came to their house the next morning, Fairbanks claimed that he didn't know where Janna was.  And during the first part of his interview with police, Fairbanks continued to claim that he didn't know where Janna was.  By the time Fairbanks directed police to the dumpster, it had been emptied, and Janna's body was never found.  A reasonable inference from this evidence is that

---

[7] Fairbanks emphasizes that he only admitted briefly placing a pillow on Janna.  The State responds that the jury was free to choose what portions of Fairbanks's statements to believe and that the jury could have disbelieved Fairbanks when he said he removed the pillow "right away" and instead found that Fairbanks left the pillow on her.

Fairbanks knowingly placed Janna in a situation that endangered her life or health, resulting in her death. Given this evidence, we are convinced that the jury would have reached the same result even if it had not learned about the prior pillow incidents.[8]

# II. Prosecutorial Misconduct

[34] Fairbanks next contends that the prosecutor committed misconduct by presenting more than one theory to prove the neglect-of-a-dependent charge at trial. When reviewing a claim for prosecutorial misconduct that has been properly preserved, we determine "(1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected otherwise." *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014), *reh'g denied*. To properly preserve a claim of prosecutorial misconduct, the defense must, at the time of the alleged misconduct, raise a contemporaneous objection and request an admonishment; if the

---

[8] Fairbanks also challenges his conviction on the ground that the State presented insufficient evidence. Given our conclusion that the unchallenged evidence was strong enough to render harmless any 404(b) error, we need not separately address the sufficiency argument.

On a related note, Fairbanks argues that the State committed prosecutorial misconduct because "[t]he prosecution's unreasonable, distorted theory that he placed a pillow over his child to get some more sleep is not a reasonable inference from the record, but rather a concocted claim by the prosecution to underpin a conviction based on speculation." Appellant's Br. p. 28. This, however, is merely a rephrasing of Fairbanks's sufficiency argument. Given our conclusion that the evidence is sufficient to support Fairbanks's conviction, this argument fails.

admonishment is not given or is insufficient to cure the error, the defense must request a mistrial. *Thomas v. State*, 9 N.E.3d 737, 742 (Ind. Ct. App. 2014). Failure to preserve a claim of prosecutorial misconduct results in waiver of the issue on appeal. *Ryan*, 9 N.E.3d at 667.

[35] To be successful on such a claim, the defendant must establish the grounds for prosecutorial misconduct **and** that the alleged misconduct was so prejudicial that the trial court committed fundamental error by failing to sua sponte declare a mistrial. *Id.* at 667-68. Fundamental error is "an extremely narrow exception" to the waiver rule. *Id.* at 668. "[T]he defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to make a fair trial impossible." *Id.* (quotations omitted). Stated another way, to prevail under our fundamental-error analysis, the defendant must show that "under the circumstances the trial judge erred in not sua sponte raising the issue because [the] alleged errors (a) constitute clearly blatant violations of basic and elementary principles of due process and (b) present an undeniable and substantial potential for harm." *Id.* (quotations omitted). We review the alleged misconduct and all relevant information given to the jury to determine whether the alleged misconduct "had such an undeniable and substantial effect on the jury's decision that a fair trial was impossible." *Id.* (emphasis omitted).

[36] Fairbanks claims that the State engaged in misconduct by confusing the jury as to its theory for the neglect-of-a-dependent charge. Fairbanks notes that during opening statement the State argued that he did not "seek[] help" for Janna and

left her "unsupervised" and "for dead." Tr. Vol. III p. 16 (State arguing that Fairbanks "drove by a fire station multiple times" and "didn't go to the hospital"). However, Fairbanks notes that during closing argument, the State argued that he killed Janna by placing a pillow over her head and leaving the pillow on her while he slept. Fairbanks raised this argument in a motion for judgment on the evidence but did not ask for a mistrial based on prosecutorial misconduct. *See* Tr. Vol. V pp. 6-7 ("The State's theory on opening was pretty clear, that he failed to render assistance for the child. That is a completely contrary theory to the charge that we are now here for, that the Defense was on notice of. . . . Even if they were advancing the theory that they charged, there is a complete lack of evidence to support the claim for which they've charged. And so for those reasons, we're moving for a judgment on the evidence . . . ."). The trial court denied Fairbanks's motion for judgment on the evidence because the neglect charging information generally aligned with the State's pillow theory and there was "enough evidence" to present that count as charged to the jury. *Id.* at 7-8. That is, the charging information alleged that Fairbanks, who was at least eighteen years old, knowingly placed Janna, a dependent who was less than fourteen years old, in a situation that endangered her life or health (by placing and/or leaving Janna in an unsafe and/or unsupervised environment), which resulted in her death. Appellant's App. Vol. II p. 17. The jury was instructed on this as well. *See id.* at 241, 243-44. Even assuming that the State alleged a different theory in its opening statement than it presented during closing, the theory that the State submitted to the jury at the end of the case aligned with the charging information and is supported by the evidence

presented at trial. And there is no rule that prevents the State from presenting the jury with alternate ways to find the defendant guilty as to one element. *See Baker v. State*, 948 N.E.2d 1169, 1175 (Ind. 2011) (jury-unanimity case), *reh'g denied*. Accordingly, Fairbanks has not proven that the alleged misconduct was so prejudicial that the trial court committed fundamental error by failing to sua sponte declare a mistrial.[9]

## III. Jury Taint

[37] Fairbanks next contends that juror misconduct occurred during trial when a juror used her phone to research police investigations and credibility, warranting a new trial under the Indiana Supreme Court's decision in *Ramirez v. State*, 7 N.E.3d 933 (Ind. 2014). An impartial jury is the cornerstone of a fair trial, guaranteed by the Sixth Amendment of the United States Constitution and Article 1, Section 13 of the Indiana Constitution. *Id.* at 936. To preserve impartiality and prevent taint, we prohibit unauthorized contacts and communications with jurors. *Id.* "Yet no trial is perfect, and we have long held that '[w]hile courts have a duty to ensure an impartial jury . . . jurors need not be absolutely insulated from all extraneous influences . . . .'" *Id.* (quoting *Lindsey v. State,* 260 Ind. 351, 295 N.E.2d 819, 823 (1973)). We

---

[9] Fairbanks also claims that the State engaged in misconduct by violating the "rules of evidence" during its questioning of A.G. (by using leading questions) and during its questioning of E.M. (by using hearsay). Although Fairbanks objected at trial, he did so on evidentiary grounds and did not request a mistrial based on prosecutorial misconduct. Neither of these instances amounts to prosecutorial misconduct.

therefore entrust trial courts with the difficult responsibility of discerning when extraneous influences become irreparable taint warranting a new trial. *Id.*

[38] Our Supreme Court clarified in *Ramirez* the procedure trials courts are to follow in handling instances of juror misconduct. Defendants seeking a mistrial for suspected jury taint are entitled to the presumption of prejudice only after making two showings, by a preponderance of the evidence: (1) extra-judicial contact or communications between jurors and unauthorized persons occurred and (2) the contact or communications pertained to the matter before the jury. *Id.* at 939. The burden then shifts to the State to rebut this presumption of prejudice by showing that any contact or communications were harmless. *Id.* If the State does not rebut the presumption, the trial court must grant a new trial. *Id.*

[39] Here, during trial, defense counsel notified the court that his law clerk, who was a certified intern, overheard a juror "playing something on [her] phone about police investigations or credibility or something." Tr. Vol. III p. 80. The juror was alone in the hallway outside the courtroom at the time. The prosecutor also saw the juror in the hallway—which the prosecutor thought was "shocking" since the witnesses were out there as well, *id.* at 81—but the prosecutor did not hear the juror playing anything on her phone. According to defense counsel, "There wasn't anything specifically about Mr. Fairbanks or this case. [My law clerk] has indicated it sounded more like . . . a YouTube video that . . . you would go to, a how-to or something." *Id.* When the court asked defense counsel if he wanted the court to address the matter with the

juror, defense counsel expressed reluctance. That is, defense counsel believed that his law clerk was the only one who heard this, and he appeared to be concerned about the consequences to the defense if the juror was questioned but then remained on the panel. *Id.* at 82. Again, the court asked defense counsel exactly what he was requesting. Defense counsel responded:

> [Defense Counsel]: Judge, I – I'm not making a formal request at the time, just bringing that to the Court's attention.
>
> [Trial Court]: Okay. Well, the Court is willing to address it with the juror if the Defense wants. But I've just heard one reason why it sounds like you don't want that to occur. But I don't want anything unclear in this record. Do you want me to address it with this juror?
>
> [Defense Counsel]: Not at this time, unless something else comes up, Judge.

*Id.* at 83-84.

[40]   Fairbanks is not entitled to relief under *Ramirez*. *Ramirez* applies only "whenever [d]efendants seek[] a mistrial for suspected jury taint." *Wahl v. State*, 51 N.E.3d 113, 116 (Ind. 2016), *reh'g denied*; *see also Ramirez*, 7 N.E.3d at 940 ("**Once defendants move for mistrial**, trial courts should assess whether or not there is enough evidence to meet the two-part showing . . . ." (emphasis added)). Fairbanks, however, did not seek a mistrial. *Cf. Bisard v. State*, 26 N.E.3d 1060, 1067-68 (Ind. Ct. App. 2015) (the defendant moved for mistrial upon learning that a juror had performed an internet search on the reliability of

blood tests; we affirmed the trial court's remedy of replacing the juror with an alternate as opposed to the more extreme remedy of declaring a mistrial), *trans. denied*.

[41]     Moreover, Fairbanks rejected the trial court's offer to question the juror. He thus invited any error relating to the court's failure to question the juror. *See Durden*, 99 N.E.3d at 656 (finding that the defendant invited the structural error of the trial court's constitutionally defective procedure for removing and replacing a juror after deliberations had begun by expressly declining "any caveats" or special instructions for the jury and repeatedly assuring the court of his approval of the procedure employed, despite its defects). Fairbanks is not entitled to a new trial based on juror misconduct.

# IV. Constitutionality of Neglect Statute

[42]     Last, Fairbanks contends that the neglect-of-a-dependent statute is "unconstitutionally void for vagueness." Appellant's Br. p. 31. Fairbanks, however, did not make this constitutional challenge below by way of a motion to dismiss; accordingly, the State argues that he has waived this argument. But because appellate courts have the discretion to consider constitutional challenges even when the defendant has failed to file such a motion, *see McBride v. State*, 94 N.E.3d 703, 709-710 (Ind. Ct. App. 2018) (citing cases), we address Fairbanks's argument.

[43]     A challenge to the validity of a statute must overcome a presumption that the statute is constitutional. *Brown v. State*, 868 N.E.2d 464, 467 (Ind. 2007).

[44] Due-process principles provide that a penal statute is void for vagueness if it does not clearly define its prohibitions. *Id.* A criminal statute may be invalidated for vagueness for two reasons: (1) for failing to provide notice enabling ordinary people to understand the conduct that it prohibits or (2) for the possibility that it authorizes or encourages arbitrary or discriminatory enforcement. *Id.* "[T]here must be something in a criminal statute to indicate where the line is to be drawn between trivial and substantial things so that erratic arrests and convictions for trivial acts and omissions will not occur. It cannot be left to juries, judges, and prosecutors to draw such lines." *Id.* (quotation omitted). A statute "is not void for vagueness if individuals of ordinary intelligence could comprehend it to the extent that it would fairly inform them of the generally proscribed conduct." *Id.* (quotation omitted). And the statute does not have to list specifically all items of prohibited conduct; rather, it must inform the individual of the conduct generally proscribed. *Id.* The examination of a vagueness challenge is performed in light of the facts and circumstances of each individual case. *Id.*

[45] Fairbanks challenges the following portion of the neglect statute: "places the dependent in a situation that endangers the dependent's life or health." I.C. § 35-46-1-4(a)(1). He argues:

> The prosecution argued that sleeping fits the statutory definition of neglect. Specifically, the prosecution argued: "So the child is not supervised for hours. Just because he's in the room—if he's asleep, he can't supervise." Tr. Vol. V, p. 8. Clearly, the prosecution's argument that a parent can be prosecuted for sleeping attempts to criminalize normal behavior. The statute

provides that the mere presence of an adult when a minor dies results in a criminal act. This is far too liberal of a standard for the basis of any statute in the criminal code.

Appellant's Br. p. 32. But Fairbanks's starting premise is wrong; the State did not argue that it's a crime for a parent to sleep. Rather, the State argued that Fairbanks placed Janna in an unsafe environment by placing a pillow on her **and then** going to sleep while he left the pillow on her:

> In reference to the neglect count, we have proven that the defendant placed Janna . . . in an unsafe environment. The unsafe environment is that at around eight o'clock in the morning, . . . we believe he placed a pillow over her head, and somewhere along the line, he went back to sleep. And he, in his own testimony . . ., he says he doesn't wake up until 1:30. So the child is not supervised for hours. Just because he's in the room— if he's asleep, he can't supervise.

Tr. Vol. V pp. 7-8. In short, this is the difference between putting an infant to sleep in a safe environment and then going to sleep versus putting an infant to sleep in an unsafe environment and then going to sleep. Only one of these can be considered neglectful. There is no merit to Fairbanks's constitutional challenge to the neglect statute.

[46] Affirmed.

Barnes, Sr. J., concurs.

Pyle, J., concurs in result with separate opinion.

ATTORNEYS FOR APPELLANT

G. Allen Lidy
Lidy Law, PC
Mooresville, Indiana

John V. Siskopoulos
Siskopoulos Law Firm, LLP
Boston, Massachusetts

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Laura R. Anderson
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jeffrey Fairbanks,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | August 1, 2018<br><br>Court of Appeals Case No.<br>49A02-1707-CR-1675<br><br>Appeal from the Marion Superior<br>Court<br><br>The Honorable Sheila A. Carlisle,<br>Judge<br><br>Trial Court Cause No.<br>49G03-1508-MR-30525 |

**Pyle, Judge, concurring in result with opinion.**

[47]    I concur with my colleagues' decision to affirm Fairbanks' conviction for neglect of a dependent resulting in death. However, my journey to our decision takes a short, but important, detour regarding whether Fairbanks properly preserved a request for a continuing objection as an issue for appeal. My review of the record reveals that the motion for a continuing objection was made, but the trial court never ruled on the motion. As a result, I believe the issue was waived.

[48] Continuing objections serve a useful purpose. "That is, they avoid the futility and waste of time inherent in requiring repetition of the same unsuccessful objection each time evidence of a given character is offered." *Hayworth v. State*, 904 N.E.2d 684, 692 (Ind. Ct. App. 2009). As my colleagues ably point out, the procedure for requesting a continuing objection has been established, and "**must be carefully** followed if attorneys wish to use continuing objections and still properly preserve the admission of specific evidence as an issue on appeal." *Id*. (emphasis added). First, the attorney objecting to the proffered evidence must ask that the trial court "consider the same objection to be made and overruled each time a class of evidence is offered." *Id*. The trial court may grant or deny the attorney's request. Generally, a party must make an objection and receive a ruling to each and every piece of evidence believed to be inadmissible. *Id*. However, a continuing objection is an exception. *Id*. If the trial court grants the request for a continuing objection, then the attorney "does not have to object each time the class of evidence is subsequently offered." *Id*. "If, however, the trial court does not **specifically** grant the right to a continuing objection, it is counsel's **duty** to object to the evidence as it is offered in order to preserve the issue for appeal." *Id*. (emphasis added); *see also* Ind. Evid. R. 103(b) ("Once the court rules **definitively** on the record at trial a party need not renew an objection or offer proof to preserve a claim of error for appeal.") (emphasis added). "Error can only be predicated on questions presented to **and** ruled upon by the trial court." *Wells v. State*, 441 N.E.2d 458, 463 (Ind. 1982) (emphasis added).

[49]     In considering whether the trial court specifically granted Fairbanks' request for a continuing objection, it is helpful to reproduce the colloquy surrounding the request:

| | |
|---|---|
| [Defense Counsel]: | I think the only other issue we had is we would – just to make our record clean, we would move to incorporate the hearings – the hearing and the subsequent ruling by the Court on 3/29 and the Court's order from April 13, 2017. |
| | As well as the parties agree to stipulation – two stipulations, I believe. One is just a matter of law, that the State and Defense have gotten together and redacted several portions of defendant's statements. And we agree on those redactions. |
| | We subsequently agreed that as a matter of law, that doesn't open the door – the State can't open the door itself to the matters decided by the Court, specifically the 404(b) and 401, 403 issues that the Court decided in its order on 4/13. |
| | And finally, Judge, we would like to show a continuing – continuing objection to the pillow evidence that the Court denied in 3(G)(2) of the Motion in Limine. I can object, obviously, at the time, but just wanted to show a continuing objection to that evidence. |
| The Court: | Okay. Anything in response? |
| [Deputy Prosecutor]: | I just have this – the stipulation that the defense wanted us to do. It's a stipulation to a matter of law, so it's not |

|  |  |
|---|---|
|  | to be read to the jury.  It's in reference to the redactions.  They're going to get transcripts.  We've agreed that they get the transcripts and will be watching the video.  But, of course, the transcripts have huge amounts of blacked out parts.  And so – |
|  | (Jury returned into open court at 1:01 p.m.) |
| The Court: | Welcome back.  If you'd all remain standing with me, the jurors that is. Everyone else in the courtroom may be seated. |
|  | Now that you've been selected to serve as our jury, I need to give you the oath to serve.  If you'd all raise your right hands. |
|  | (Oath administered to jury) |

Tr. Vol. III pp. 2-4.  The trial proceeded without the trial court ruling on the request for a continuing objection.  I do not believe the trial court's utterance of the word "Okay" was in any way related to a ruling on the motion.  The trial court was simply acknowledging the request had been made, it sought a response from the State, and was interrupted by the entry of the jury into the courtroom before it could make a ruling.  As a result, the issue was neither ruled upon nor preserved for appeal.

[50] Nevertheless, we may still consider this issue if Fairbanks can show that the admission of the testimony regarding the prior pillow incidents amounted to fundamental error.  "The fundamental error doctrine is an exception to the

general rule that the failure to object at trial constitutes a procedural default precluding consideration of an issue on appeal." *Jewell v. State*, 887 N.E.2d 939, 940 n.1 (Ind. 2008). Our supreme court has noted that on rare occasions, we may use the fundamental error doctrine "to address on direct appeal an otherwise procedurally defaulted claim. But fundamental error is extremely narrow and available only when the record reveals a clearly blatant violation of basic and elementary principles, where the harm or potential for harm cannot be denied, and which violation is so prejudicial to the rights of the defendant as to make a fair trial impossible." *Id*. at 942.

[51] For the reasons expressed by my colleagues above, I do not believe Fairbanks has shown that the admission of the pillow evidence constitutes fundamental error. As a result, I rejoin my colleagues and concur in the reasoning and holding as to all other issues.