Robert Lawrence HICKS, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 68S00–9606–CR–431.

Supreme Court of Indiana.

Dec. 23, 1997.

Lon D. Bryan, Muncie, for Appellant.

Jeffrey A. Modisett, Attorney General Andrew Hedges, Deputy Attorney General, Indianapolis, for Appellee.

BOEHM, Justice.

In this direct appeal from convictions for murder and feticide Robert Lawrence Hicks contends that the trial court erred in admitting evidence of Hicks' violent relationship with the victim. Two other evidentiary rulings are also challenged. We affirm the convictions but remand for new sentencing pursuant to *Smith v. State*, 675 N.E.2d 693 (Ind.1996) because the trial court used the incorrect sentencing statute.

### Factual Background

One morning in July 1994 a neighbor discovered the dead body of Nicole Lynn Koontz lying face down in her manufactured home. She had been shot three times at close range—the fatal shot was administered to her head—and had been dead for several hours. The unborn baby she had been carrying for twenty-nine weeks was also dead. There was no evidence of breaking and entering or of sexual assault. Bullet casings and a live round of ammunition found at the crime scene suggested that the murder weapon was a .25 caliber handgun. As part of their investigation, police interviewed several people, including defendant Robert Hicks and his friend and business partner David Shane. Hicks was Koontz's boyfriend of several years and the putative father of the unborn baby. Hicks and Koontz had separated in March 1994. Since then, Hicks had been living off and on with Shane in the same park as Koontz.

In their initial statements to police Hicks and Shane provided identical stories. They said that on the night of the shooting they were together drinking at several bars and did not return to Shane's home until about 1:30 a.m. when they both went to sleep. They also denied knowledge of or access to a .25 caliber handgun. Police quickly learned that both were lying. One of Koontz's neighbors told them that she saw Shane's truck drive past her as she was jogging near her house at about 11:30 p.m. More significantly, police found gun casings resembling those discovered at the crime scene on Hicks' parent's property. Hicks' parents told police that Hicks and Shane sometimes shot Shane's handgun in the back yard for target practice. Police also found a live bullet from what appeared to be a .25 caliber weapon in Shane's truck. Subsequently, Shane changed his statement to acknowledge that he had access to a gun and that he and Hicks

had returned home closer to midnight. He also said that Hicks left the home at some point to visit Koontz.

Both Hicks and Shane were indicted for Koontz's murder in May 1995. The day of the indictment, Shane changed his story to a third version. He told police that when he and Hicks returned home, Hicks asked Shane to take him to Koontz's and Shane complied. They rode over on Shane's motorcycle. When they arrived, Hicks told Shane that if he did not emerge from Koontz's house after a brief period, Shane should go home. Shane said that this was not unusual, as Hicks frequently begged a ride to Koontz's house where he often stayed overnight. Hicks went inside and after about three or four minutes came "trotting" out. Hicks boarded the motorcycle and the two went back to Shane's home and went to sleep. The next morning, Shane continued, the two left for a painting job in New Castle. On the way, Hicks took out a handgun and said he had to get rid of it. Shane did not ask any questions, but drove to a remote area where Hicks threw the gun in a lake in a location Shane described in detail. Also that morning, Hicks received several pages on his pager and said "oh my God." Eventually, he responded and heard of Koontz's death. Shane and Hicks then reached agreement that they should tell the police their initial account of their activities on the night of the crime. Shane said that he did not tell this third version earlier because, as the two were arranging their alibis, Hicks threatened to harm Shane's daughter. The police found a gun in the lake Shane described, buried deep in mud.

At trial, Shane testified to all of the above. In addition, the State presented a forensics expert who testified that his tests proved that the gun recovered from the lake was both the murder weapon and also the source of the casings found at Hicks' parent's house. Although it was Shane's gun, Shane said he kept it in a suitcase in his truck, easily accessible to Hicks. The State also introduced evidence demonstrating the violent nature of the relationship between Hicks and Koontz. There was testimony by various

witnesses that ever since the two began dating in 1990, the relationship was marked by incidents of violence, threats, and constant argument. Specifically, witnesses testified that Hicks brutally beat Koontz with his fists in January 1991 and that Hicks suffered stab wounds to his leg and shoulder in June 1993. Acquaintances testified that Koontz often provoked Hicks verbally and that he sometimes responded violently. There was testimony that she once chased Hicks around their home with a knife and on one occasion pointed a firearm at him and pulled the trigger. Witnesses spoke of several occasions when Hicks said he wanted Koontz dead. There was also evidence that the week of the murder Koontz telephoned Hicks' parents and threatened to take his life. This call was one of over forty Koontz made to the parents' home in one weekend seeking financial and personal help in preparing for the soon to be born baby. Finally, there was no evidence of violence or confrontation between Koontz and Shane.

The defense claimed that this evidence did not prove Hicks guilty beyond a reasonable doubt. The jury disagreed and found Hicks guilty of murder and feticide. The trial court sentenced Hicks to sixty years for murder, eight years for feticide, and suspended four years of each sentence. This appeal followed.

## I. Evidence of Prior Bad Acts

### A. *Standard for assessing Rule 404(b) claims*

■ Hicks contends that the trial court erred in admitting several items of evidence under Indiana Evidence Rule 404(b). That rule provides in part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...." This Rule is virtually identical to Federal Rule of Evidence 404(b).[1] It is designed to prevent the jury from assessing a defendant's present guilt on the basis of his past propensities, the so called

---

1. The Federal Rule includes the word "opportu- nity" in the list of other purposes.

"forbidden inference." Prior actions may be admissible to show motive, intent, or other proper purpose. The list of other purposes is illustrative not exhaustive. *Hardin v. State*, 611 N.E.2d 123, 129 (Ind.1993); *United States v. Russell*, 971 F.2d 1098, 1106 (4th Cir.1992).

Hicks suggests that the proper standard for assessing 404(b) claims in Indiana is the one applied in the United States Court of Appeals for the Seventh Circuit. Under this test, to be admissible: (1) the evidence must be directed toward establishing a matter in issue other than the defendant's propensity to commit the charged act; (2) the prior bad act must be similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence must be sufficient to support a finding by the jury that the defendant committed the prior bad act; and (4) the proponent of the evidence must show that the probative value of the prior bad act is not substantially outweighed by its prejudicial effect on the defendant. *United States v. Hudson*, 884 F.2d 1016, 1018–19 (7th Cir. 1989). *See also United States v. Smith*, 103 F.3d 600, 603 (7th Cir.1996). Hicks cites *Pirnat v. State*, 612 N.E.2d 153, 155 (Ind.Ct. App.1993) where the Indiana Court of Appeals endorsed this four pronged test. Other Indiana Courts of Appeals have also used the Seventh Circuit test. *Sloan v. State*, 654 N.E.2d 797, 800 (Ind.Ct.App.1995) (stating that "[w]e have adopted [the Seventh Circuit's] four part test"); *Christian–Hornaday v. State*, 649 N.E.2d 669, 671 (Ind.Ct.App. 1995).

■ This Court has not explicitly addressed whether the Seventh Circuit's test or its functional equivalent applies to claims under our recently enacted Rules of Evidence. However, our decisions have consistently applied a two part test that is substantially equivalent to the first (relevance) and fourth (balancing) prongs of the Seventh Circuit test.[2] Under that view, a trial court faced with a 404(b) question must: (1) decide if the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act;[3] and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. *Hardin*, 611 N.E.2d at 128–29.[4] *See also Heavrin v. State*, 675 N.E.2d 1075, 1083 (Ind.1996); *Taylor v. State*, 659 N.E.2d 535, 543 (Ind. 1995). These two prongs incorporate Rules 401, 402, and 403 into Rule 404.

■ We see no persuasive reason to adopt the Seventh Circuit test. The second prong, which Hicks invokes, that prior bad acts must be similar and close in time to the charged conduct in order to be relevant, is followed only by the Seventh and Eighth Circuits.[5] In our view, this prong unnecessarily restricts the discretion of the trial court to determine whether 404(b) evidence is relevant. The Rule says that "other crimes, wrongs, or acts" not offered to prove character "may be admissible." This throws the analysis back to Rule 402 which states that "all relevant evidence is admissible." "Relevant evidence" is defined in Rule 401 as "evidence having any tendency to make the existence of any fact that is of consequence

---

**2.** These two prongs or their substantial equivalent are part of the 404(b) standard in each circuit of the United States Courts of Appeals. *See* 2 WEINSTEIN'S FEDERAL EVIDENCE § 404.21[1][a]–[m] (2d ed. 1997).

**3.** The relevance prong incorporates Rule 401, the definition of relevant evidence, into Rule 404(b). Weinstein breaks down the relevance prong into three general considerations: (1) whether the evidence is offered to prove a consequential fact that is material to the case, (2) the evidential theory or hypothesis by which the consequential fact may be inferred from the evidence, and (3) whether the evidence tends to prove the consequential fact. 2 WEINSTEIN'S FEDERAL EVIDENCE at § 404.21[2][a].

**4.** *Hardin* predated the adoption of Indiana's version of the Federal Rules of Evidence, effective January 1, 1994. As a matter of common law, *Hardin* adopted Federal Rule of Evidence 403 and stated that the trial court must apply Rules 404 and 403 in conjunction with each other. Rule 404 had already been adopted in *Lannan v. State*, 600 N.E.2d 1334 (Ind.1992).

**5.** *See, e.g., United States v. Turner*, 104 F.3d 217, 222 (8th Cir.1997). The Ninth Circuit requires that the prior act not be too remote in time and, if knowledge and intent are at issue, the prior act must be similar to the charged crime. *United States v. Tsinnijinnie*, 91 F.3d 1285, 1288–89 (9th Cir.1996).

to the determination of the action more probable or less probable than it would be without the evidence." Neither Rule 404 nor Rule 401 mentions similarity or temporal proximity as a condition of admissibility. To be sure, depending on the collateral fact they are offered to show, these factors may bear on relevance. But they are not in and of themselves requirements of the Rule. Rather, relevance is defined broadly as probative value, and the trial court has wide discretion in ruling on the relevance of evidence under Rule 402. *See United States v. Ahangaran,* 998 F.2d 521, 525 (7th Cir.1993); *cf. Reaves v. State,* 586 N.E.2d 847, 858 (Ind.1992) (at common law, the trial court had wide discretion in making relevance rulings). This discretion includes determining the significance of the similarity or remoteness of evidence. *Fisher v. State,* 641 N.E.2d 105 (Ind.Ct.App. 1994) (remoteness of evidence is to be considered in determining relevance and ultimately admissibility). Some proffered evidence may be irrelevant because it is too remote. For example, the fact that an adult defendant threatened the victim when both were children does not tell us much about their relationship today. On the other hand, an event occurring in the past can be critical. If the defendant stole the murder weapon twenty years ago and its presence is unaccounted for in the interim, the relevance of the gun theft to show access to the weapon is not obviated by the passing of time or by the dissimilarity between theft and murder. In short, admissibility hinges on relevance, not a litmus test based on an isolated factor—remoteness,

similarity, or anything else—that may bear on relevance.[6]

The third prong of the Seventh Circuit test requires that evidence of a prior bad act must be sufficient to support a finding by the jury that the defendant committed the act.[7] It derives from the Seventh Circuit's reading of *Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). *Huddleston* dealt with the question whether a district court must make a preliminary finding that a prior bad act had been proved by a preponderance of the evidence before submitting the evidence to the jury. *Id.* at 682, 108 S.Ct. at 1497. The Court held that no such finding was necessary and concluded that prior act evidence "should be admitted if there is sufficient evidence to support a finding by the jury that the defendant committed the [prior bad] act." *Id.* at 685, 108 S.Ct. at 1499. The Court made this observation, however, in the specific context of relevance that was conditioned on establishing an additional fact.[8] In *Huddleston,* the issue was whether the defendant knew that goods he sold were stolen. The government introduced evidence of prior similar acts where the defendant sold tens of new appliances at very low cost. This would be relevant under 404(b) only if the appliances in the prior sales were in fact stolen and the defendant knew that, both conditional facts to be established.

In our view, the *Huddleston* formulation does not establish an additional test for admission under Rule 404(b). Rather, it is simply the application of the relevance requirement to the situation where it is chal-

---

6. Indeed, the Seventh Circuit does not always discuss the similarity/remoteness prong or the four part test when deciding 404(b) issues. *United States v. McKinney,* 954 F.2d 471, 480 (7th Cir.1992) (no mention of four part test in declaring admissible evidence of marijuana transaction twenty months before murder that showed hostility to the victim; this was not too remote to be relevant because early manifestations of defendant's hatred of the victim, which built over time, were admissible); *United States v. Chaverra-Cardona,* 879 F.2d 1551, 1554 (7th Cir.1989) (evidence of drug operations admissible to show motive in murder case; no mention of four part test or of similarity prong). In sum, when a trial court considers whether a prior bad act is relevant, proximity and similarity ordinarily will enter into the analysis, but in Indiana at least, they are *not conditions to a finding of relevance.*

7. Originally, the Seventh Circuit required that this evidence must be clear and convincing, not merely sufficient. *United States v. Shackleford,* 738 F.2d 776, 779 (7th Cir.1984). In *Hudson,* 884 F.2d at 1018, this was changed to a sufficiency standard in light of the Supreme Court's holding in *Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988).

8. The Federal and Indiana versions of Evidence Rule 104(b) provide: "When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."

---

lenged whether the defendant committed the prior act or whether the prior act if proven supported any inference as to any issue in the case. Thus, this requirement in that context is simply an application of what Evidence Rule 104(b) already guarantees, i.e., before a trial court may admit evidence of prior bad acts it must be satisfied that the evidence is relevant. "[T]he Government may [not] parade past the jury a litany of potentially prejudicial [prior bad acts] that have been established or connected to the defendant only by unsubstantiated innuendo." *Id.* at 689, 108 S.Ct. at 1501.[9]

In sum, the standard for assessing the admissibility of 404(b) evidence in Indiana is: (1) the court must determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) the court must balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403.[10] When inquiring into relevance, the court may consider any factor it would ordinarily consider under Rule 402. These may include the similarity and proximity in time of the prior bad act to the charged conduct, and will presumably typically include tying the act to the defendant. But these factors are simply illustrative of the many aspects that may,

depending on the context, be required to show relevance.

## B. The Merits of Hicks' 404(b) Claims

Hicks contends error under Rule 404(b) in admitting: (1) testimony by two witnesses about an incident in January 1991 when Hicks severely beat Koontz with his fists; (2) testimony that in the summer of 1993 Hicks suffered knife wounds on his legs and arms and Koontz suffered a black eye after the two had an argument; (3) testimony that Hicks "beat [Koontz] up in the kitchen" in January 1994; and (4) admissions Hicks made about his violent relationship with Koontz in his statement to police the day after the murder. Hicks also contends that it was error to admit various statements Hicks made to witnesses that reflected his hostility toward Koontz.[11] All of the above were objected to on 404(b) grounds at trial.

Specifically, Hicks makes two contentions. First, he cites *Pirnat*, 612 N.E.2d at 153, which applied the Seventh Circuit's four part 404(b) test, and contends that the incidents were too remote in time to be relevant and that they were not similar enough to the murder because they did not involve a gun. Similarly, he says the admis-

9. We note that this Court has on one occasion cited the *Huddleston* sufficiency prong as in accord with Indiana law. *Clemens v. State*, 610 N.E.2d 236, 242 (Ind.1993). This case in substance is fully consistent with the analysis of our opinion today. *Cf. Gibbs v. State*, 538 N.E.2d 937 (Ind.1989) (under common law, evidence of prior acts is relevant only if the evidence is sufficient to establish the defendant as the perpetrator).

10. Prejudice is the normal countervailing factor. Rule 403 lists others—confusion of the issues, misleading the jury, undue delay, and the needless presentation of cumulative evidence. The conventional situation presented in 404(b) cases—and in this case—is the danger of unfair prejudice posed by the other crime, wrong, or act. We do not, however, preclude a 404(b) challenge under the balancing prong on the other factors listed in Rule 403.

11. Specifically, Hicks contends error in admitting: (1) testimony that in the summer of 1992 Hicks said on two occasions that "he wanted [Koontz] dead"; (2) testimony that three months before the murder Hicks said that he "wished

[Koontz] was dead"; and (3) testimony that two days before the murder Shane told the witness, in Hicks' presence, that Hicks had said to him: "take me over there, take me over there, I just ... I just want to shoot her." These claims are easily dealt with because they are not evidence of "other crimes, wrongs, or acts" for 404(b) purposes. When Hicks said he wanted Koontz dead, wished she was dead, or that he would like to just go over there and shoot her, he was making a statement about his state of mind at the time. To state what one is feeling, as opposed to a direct threat to the victim, is not a "bad act" as such. Accordingly, the trial court did not err in admitting this evidence over 404(b) objections.

Hicks also contends that the testimony about what Shane said Hicks said was inadmissible hearsay. We disagree. The statement is not hearsay because it is a statement by a party opponent, made in a representative capacity. Evid.R. 801(d)(2)(A). The witness testified that Shane repeated Hicks' desire to go over to Koontz's and shoot her only after Hicks looked at Shane and told him to tell the witness about it. Accordingly, Hicks made Shane his representative and the statement is not hearsay.

sions he made about the couple's violent relationship were not sufficiently similar to the act of murder to be relevant. Second, he contends that the evidence of domestic violence was propensity evidence. The State responds that evidence of Hicks' violent relationship with Koontz is admissible evidence of motive. As detailed *supra*, remoteness in time or dissimilarity do not render 404(b) evidence per se inadmissible. Rather, the timing and similarity of the incidents are factors in the larger inquiry into whether the incidents were relevant to a matter in issue. In particular, similarity between the prior act and the charged conduct is not a major consideration when the prior act is offered to show motive, even if it may be critical if offered to prove identity by a "signature" technique. ROBERT L. MILLER, JR., COURTROOM HANDBOOK ON INDIANA EVIDENCE 68 (1998 ed). *Taylor*, 659 N.E.2d at 543 (informations detailing defendant's past charged sexual abuse of the victim were admissible to show motive for murder); *Kimble v. State*, 659 N.E.2d 182, 185 (Ind.Ct.App.1995) (evidence of membership in a racist organization admissible to show motive for felony murder).[12] Here, the evidence of domestic violence was neither too remote nor too dissimilar to be relevant.

Under the first part of the 404(b) test, if the evidence of prior acts of domestic violence was offered only to show that Hicks was of bad character and acted in conformity therewith by murdering Koontz, then the evidence would be inadmissible. The State cites *Guenthensperger v. State*, 566 N.E.2d 61, 62 (Ind.1991) for the proposition that "evidence of a defendant's prior assaults, batteries, or threats against a homicide victim is admissible to prove motive." *Guenthensperger*, though directly on point, was decided prior to the adoption of Rule 404(b) and does not control the admissibility of evidence under this Rule. The substance of the holding in *Guenthensperger* has, however, been repeated in Rule 404(b) cases. As we recently held in *Ross v. State*, 676 N.E.2d 339, 346 (Ind.1996), "[a] defendant's prior bad acts are ... usually admissible to show the relationship between the defendant and the victim." *See also Elliott v. State*, 630 N.E.2d 202, 204 (Ind.1994) (prior threats of violence to ex-wife and victim admissible to show the relationship between the parties and defendant's motive); *Price v. State*, 619 N.E.2d 582, 584 (Ind.1993) (prior bad acts against the victim are admissible "to show the relationship between the parties and appellant's motive"). Federal courts agree. More precisely, as the Fourth Circuit put it in *United States v. Russell*, 971 F.2d at 1106–07, "[h]ostility is a paradigmatic motive for committing a crime." In Hicks' case, the hostility between him and Nicole existed from the relationship's inception, as shown by the incident of abuse of the victim in 1991, and continued up to the time

---

12. Although not raised by Hicks, some Indiana Courts of Appeals have construed the motive exception narrowly, holding that the 404(b) exceptions are available only when a defendant goes beyond merely denying the charged crime and affirmatively presents a claim contrary to the charge. *Carson v. State*, 659 N.E.2d 216, 218–19 (Ind.Ct.App.1995); *Reynolds v. State*, 651 N.E.2d 313, 316 (Ind.Ct.App.1995); *Bolin v. State*, 634 N.E.2d 546, 550 (Ind.Ct.App.1994) (identity exception). For this proposition, these cases ultimately rely on *Wickizer v. State*, 626 N.E.2d 795 (Ind.1993). *Wickizer*, however, pertained to the intent exception under 404(b) and did not address the other exceptions. *Wickizer* held that the intent exception was available only when a defendant went beyond merely denying the charged culpability and affirmatively presented a claim of particular contrary intent. *Id.* at 799. In this respect, intent is unlike the other listed exceptions in 404(b). Intent is often an element of the crime and is likely to be found relevant. A prior intent to commit a bad act, however, although of some relevance, "introduces the sub-

stantial risk of conviction based predominantly on bad character." *Id.* at 797. That is, a defendant's prior intent to harm the victim or some other person may be relevant to show that the defendant had the requisite intent in the charged crime. But this prior intent, whatever its relevance, is likely to create the forbidden inference that because the defendant meant to cause harm before, he must have meant to cause harm in this case. Because of this danger and the relevance of intent generally, *Wickizer* narrowly construed the intent exception. Motive and most other collateral issues are unlike intent in this respect. The relevance and admissibility of motive is tied to the facts of the specific crime. A bad relationship between the defendant and another person does not bear on the defendant's motive to harm the victim and will rarely be either relevant or admissible to show motive for the charged conduct. For this reason, evidence offered to show motive is less likely than intent to be relevant as a general matter and thus to create the forbidden inference. Accordingly, *Wickizer* does not apply to all exceptions under Rule 404(b).

of the murder. *See generally United States v. Hinton,* 31 F.3d 817, 822–23 (9th Cir.1994) (testimony about accused's four previous assaults on his wife was admissible to show motive in a prosecution for assault with intent to murder); *Hopkinson v. Shillinger,* 866 F.2d 1185, 1197–98 (10th Cir.1989) (evidence of intense disputes between defendant and victim admissible to show motive for murder) (applying Wyoming law).

Although the evidence was relevant to show motive, it may still be inadmissible under the second prong of the 404(b) test if its probative value is substantially outweighed by the danger of unfair prejudice. Evid.R. 403. We review this balancing act by the trial court under an abuse of discretion standard. *Mayberry v. State,* 670 N.E.2d 1262, 1268 (Ind.1996). As discussed above, the evidence of domestic violence was probative of the hostility between the parties. But in a case like this, at some point testimony about every incident of violence between the two becomes more prejudicial than probative. The 1992 and 1994 incidents and Hicks' statements to the police illustrated the hostile relationship that could have been a motive for murder. However, testimony about the January 1991 incident was graphic, prejudicial, and of low probative value. Shane and his wife at the time testified that Hicks, who was living next door with Koontz, broke into their home at about 3:00 a.m., covered in blood, and yelled "Call 911.... I think I killed her this time." Shane and his wife called 911, went next door, and found Koontz lying semi-conscious in a pool of blood. Shane said that her head was "busted open." This testimony, though relevant to show the hostility of the relationship, was of fairly low probative value in view of its remoteness in time. Its probative value was further reduced because the State had ample evidence of hostility, including the other two more recent incidents and Hicks' own statements, upon which it could rely. The prejudicial impact of the testimony, however, was sure to be high and substantially outweighed its probative value. Accordingly, the trial court erred in admitting it. However, considered in light of all the other evidence about the relationship, testimony about this one incident of domestic violence was cumu-lative and is not grounds for reversal. *Chappel v. State,* 591 N.E.2d 1011, 1015 (Ind. 1992).

## II. Hearsay Testimony

At trial, Betty Bentley testified that at about 10:30 on the night of the murder, she spoke with Koontz on the telephone. Bentley said Koontz told her that earlier that night, at about 6:00, Koontz had had an argument with Hicks on the telephone. Koontz wanted Hicks to come over and help build the baby's nursery but Hicks would not say when or if he would stop by at all. According to Bentley, Koontz said that she yelled at Hicks so hard that she wet her pants. Hicks contends, pursuant to his objection at trial, that this statement was inadmissible hearsay. Evid.R. 801, 802. The State concedes it was hearsay if offered to show the relationship between Koontz and Hicks, but contends it was admissible to show Koontz's state of mind under Indiana Evidence Rule 803(3).

Rule 803(3) provides that: "A statement of the declarant's then existing state of mind...." is not excluded by the hearsay rule. As Hicks points out, Koontz's conversation with Bentley occurred at least four hours after she expressed her anger with Hicks. Although Koontz told Bentley she was still upset with him, the gist of the conversation was Koontz's report about how upset she felt at the time of her conversation with Hicks, four hours before, and not of her "then existing" state of mind, as required by the Rule. Accordingly, the statement was not admissible under the state of mind exception. Nevertheless, it was harmless error to admit the testimony. There was ample additional evidence to show that Hicks and Koontz often and recently argued. Accordingly, the error in admitting the testimony was harmless. *Chappel,* 591 N.E.2d at 1015.

## III. Opinion Testimony

At trial, Tamara Hodson testified that she spoke with Hicks on the phone the day Koontz's body was discovered. Hodson said she told him that he should go to Koontz's manufactured home or "they would

assume he did it." Hicks contends that this was an impermissible opinion as to what "they" thought of Hicks' guilt or innocence under Indiana Evidence Rule 704(b). Hicks also contends that Hodson did not have personal knowledge that "they would assume he did it" and so the opinion should be excluded under Indiana Evidence Rule 602. We disagree. Although Rule 704(b) does prohibit opinion testimony concerning a defendant's guilt or innocence, Hodson's statement hardly fits this category. Her suggestion simply informed Hicks that his absence from the crime scene would appear suspicious. She expressed no opinion as to whether she or others actually thought he was guilty or innocent. Accordingly, Rule 704 was not implicated by her testimony. Similarly, Hudson's testimony did not violate Rule 602's mandate that a witness may not testify without personal knowledge of the matter. Hudson did not testify to what "they" actually thought but only to the fact that she told Hicks that other people might be suspicious if he did not go to the crime scene. Her personal knowledge of what she told Hicks cannot be questioned under Rule 602. Accordingly, the trial court did not err in admitting this testimony. Although its relevance is not clear, no relevance objection is raised.

## IV. Sentencing

■ The trial court sentenced Hicks as follows: a fifty year presumptive sentence for murder plus a ten year enhancement, and a four year presumptive sentence for feticide plus a four year enhancement. The court suspended four years of each sentence. Although the sentence for feticide was proper, the sentence for murder was not. At the time of the killing in July 1994, there were two versions of the sentencing statute for murder on the books. IND.CODE § 35–50–2–3. In *Smith v. State,* 675 N.E.2d 693 (Ind. 1996) we held that P.L. 158–1994, which provides a presumptive forty year sentence for murder subject to a twenty year enhancement, rather than P.L. 164–1994, which provides a presumptive fifty year sentence for murder subject to a ten year enhancement, applies to murders occurring between July 1, 1994 and May 5, 1995. At the sentencing

hearing, there was some discussion of the applicable sentencing statute. Although ultimately the court used the wrong statute, the court was careful and precise in weighing the aggravating and mitigating factors when rendering the sentence. Thus, there is reason to believe that the court's sentence might have been different had the forty year presumptive sentence been applied. Accordingly, we remand for new sentencing under P.L. 158–1994.

## Conclusion

We affirm the convictions and remand for new sentencing.

SHEPARD, C.J., and DICKSON, SULLIVAN and SELBY, JJ., concur.