## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 18 2019, 9:49 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT PRO SE[1]

David G. Kaufman

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

David G. Kaufman,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

February 18, 2019

Court of Appeals Case No.
46A05-1707-CR-1596

Appeal from the LaPorte Circuit Court

The Honorable Thomas J. Alevizos, Judge

Trial Court Cause No.
46C01-1307-FC-242

---

[1] Appellate counsel, Mary P. Lake, wrote and submitted Kaufman's Appellant Brief but withdrew her appearance prior to the handdown of this memorandum decision.

**Pyle, Judge.**

# Statement of the Case

David G. Kaufman ("Kaufman") appeals, following a jury trial, his convictions for Class C felony attempted misconduct with a minor[2] and Class D felony attempted possession of child pornography.[3] Kaufman argues that the trial court abused its discretion and violated Indiana Evidence Rule 404(b) when it admitted prior conduct evidence. The trial court admitted the evidence under the intent exception under Evidence Rule 404(b), finding it relevant to respond to Kaufman's contrary intent and tempering any prejudicial effect by specifically instructing the jury as to the limited purpose for the evidence. Under the specific circumstances of this case, we conclude that the trial court did not abuse its discretion by admitting the challenged evidence, and we affirm Kaufman's convictions.

We affirm.

# Issue

Whether the trial court abused its discretion in its admission of evidence.

---

[2] IND. CODE §§ 35-42-4-9; 35-41-5-1.

[3] I.C. §§ 35-42-4-4; 35-41-5-1. The jury also found Kaufman guilty of Class D felony child solicitation, but the record before us indicates that this charge was ultimately dismissed.

## Facts

Kaufman served as Fire Chief of the Lincoln Township Volunteer Fire Department ("Fire Department") from the 1990's until 2012. In 2006, B.D., who was thirteen years old and who wanted to be a fireman, met Kaufman and talked to him about the cadet program at the Fire Department. Although participants in the cadet program had to be sixteen years old, Kaufman invited B.D. to go the Fire Department to "hang out and basically see how everything worked." (Tr. Vol. 3 at 60). Thereafter, B.D. went to the Fire Department one day per week to watch activities at the Fire Department and learn from Kaufman.

The following year, when B.D. was fourteen years old, he was in Kaufman's office at the Fire Department, and Kaufman asked him if he wanted to make some money by participating in a "college study" during which Kaufman would "measure [B.D.'s] penis hard and soft." (Tr. Vol. 3 at 66). Kaufman told B.D. that the study would first involve measurements, then questions about his sex life, and an "opportunity for more things down the road[.]" (Tr. Vol. 3 at 66). Kaufman offered B.D. $150 to participate in the measurement part of the study and told him that the study would provide "more money for younger people." (Tr. Vol. 3 at 67). B.D. refused and told Kaufman that it was "weird." (Tr. Vol. 3 at 66). Kaufman told B.D. that he "would never hurt" him. (Tr. Vol. 3 at 67).

Kaufman continually asked B.D. to participate in the study whenever he was with B.D. Before Kaufman talked to B.D. about the study, he always "look[ed]

side to side, mak[ing] sure there wa[s] nobody standing close enough to hear him." (Tr. Vol. 3 at 68). When asking B.D. to participate in the study, Kaufman would put his arm around B.D. or grab him by the waist or his pants pockets.

[6] During the summer when B.D. was fourteen years old, Kaufman asked B.D. to mow his lawn. After finishing the job, B.D. went inside Kaufman's house to get paid. After Kaufman paid B.D. for the lawn, he then put his arm around B.D., "tried to coax" B.D. into doing the study, and told B.D. that he would "never hurt" him. (Tr. Vol. 3 at 71). B.D. refused and left Kaufman's house.

[7] B.D. mowed Kaufman's lawn once per week that summer, and each time B.D. was at Kaufman's house, Kaufman asked B.D. to participate in the study. On one specific occasion, B.D. went inside Kaufman's house after he had mowed the lawn. Kaufman went to his bedroom to get the cash, and B.D. followed him. Kaufman then sat on his bed, put his fingers in B.D.'s pocket, and pulled B.D. towards him. Kaufman then told B.D. that "if he wanted [B.D.] he could have [him]" and said that he would never hurt B.D. (Tr. Vol. 3 at 72). B.D. left Kaufman's house and never mowed his lawn again.

[8] B.D. did, however, continue with his weekly observation day at the Fire Department. And Kaufman continued his requests for B.D. to participate in the study. On B.D.'s fifteenth birthday, he was at the Fire Department, and Kaufman was "persistent" about wanting B.D. to do the study where Kaufman would "measure [B.D.'s] penis hard and soft" and "ask questions about [B.D.'s]

sex life." (Tr. Vol. 3 at 75, 76). Kaufman told B.D., "let's get this done." (Tr. Vol. 3 at 75). B.D. again refused.

[9] Another day when B.D. was at the Fire Department in the fall of 2008, Kaufman approached B.D. and told him that if he was not comfortable having his penis measured in person, then B.D. could take photos of his penis with his cell phone, load the photos on an SD card, and put the SD card in Kaufman's mailbox. Kaufman told B.D. that "it wouldn't pay as good but it was a way to get started." (Tr. Vol. 3 at 76-77). B.D. walked away from Kaufman and went to sit by Zac Richie ("Richie"), who was a fire cadet. Richie, who had overheard Kaufman ask B.D. if he "want[ed] to take penis pictures," talked to B.D. about Kaufman's request. (Tr. Vol. 3 at 96).

[10] B.D. joined the cadet program at the Fire Department when he turned sixteen and remained in the cadet program until he was seventeen years old. Kaufman did not relent in his requests for B.D. to participate in the study. B.D., however, never participated in Kaufman's study and never took any photos of himself. When B.D. was eighteen years old, he told his mother about Kaufman's repeated requests for B.D. to participate in a penis study. Thereafter, Kaufman was fired as fire chief, and the police department started an investigation into the allegations against Kaufman.

[11] In April 2013, Detective Jennifer Rhine-Walker ("Detective Rhine-Walker") interviewed Kaufman and discussed the university study with him. This

interview was recorded and a redacted version of it was played at trial.[4] During the interview, Kaufman told the detective that he had done the study in conjunction with the University of Michigan but stated that he did not remember the name of his contact person. Nor did Kaufman keep any documentation of his involvement with the study. Kaufman stated that the study was done "years and years ago" and was "very, very short lived." (State's Ex. 1B). He could not remember an exact date or the duration of the study. Kaufman stated that he was not paid to conduct the study and that the subjects did not receive any payment to do the study. Kaufman described the study as a "lifestyle survey" with "really benign" questions relating to sex, including questions about how often the subject had sex, the subject's favorite positions, and the length of the subject's penis. (State's Ex. 1B). As for the question regarding length, Kaufman initially told the detective that the subject would merely self-report the measurement and that he did not remember ever obtaining actual measurements of anyone's penis. Later, in the interview, Kaufman admitted that he had asked the male subjects to measure their penises, both flaccid and erect, and stated that he usually gave the subjects a disposable paper measuring tape to measure themselves. He stated that, at times, he would hold the tape and measure a subject's penis, but he clarified that he did not come in contact in a "sexual manner." (State's Ex. 1B). Kaufman insisted that he had never done anything of a "sexual nature" and that everything he

---

[4] The information about the interview recounted hereinafter includes only what was contained on the redacted version shown to the jury.

had done was for "information and research." (State's Ex. 1B). He also denied that he had ever taken any photographs of anyone as part of the study.

[12] In July 2013, the State initially charged Kaufman with three counts of Class C felony attempted sexual misconduct with a minor, Class D felony attempted possession of child pornography, and Class A misdemeanor false informing. The following month, the State amended the charging information and added three counts of Class D felony child solicitation.

[13] After Kaufman had been charged and the case was pending, William Duttlinger ("Duttlinger"), who had been named as the new fire chief after Kaufman, found a thumb drive in a filing cabinet in Kaufman's old office. Duttlinger inserted the thumb drive into his computer and saw photographs of fire scenes and a photograph of a naked man lying on a table. Duttlinger forwarded the thumb drive to the township trustee, who then forwarded it to Detective Rhine-Walker. Thereafter, the State sought and obtained a search warrant to search the contents of the thumb drive.

[14] A forensic analysis of the thumb drive revealed that it was registered to Kaufman and his wife. The thumb drive contained Power Point documents (relating to fire/EMS), a few Word documents, and photographs. These files were placed on the thumb drive between 2002-2013. The metadata on the thumb drive revealed that all the photographs were taken by the same model of Olympus camera, which was known to be used only by Kaufman. The photographs included images of fire scenes that were contained in a non-

concealed folder on the thumb drive and twenty-nine images of naked men that were contained in a secure, encrypted folder on the drive. All the hidden photographs were close-up images of penises in both flaccid and erect states. Some of the photographs showed various naked male subjects, who were individually photographed lying on a bed, holding a tape measure, and measuring their penises in flaccid and erect states. Some other photographs depicted these naked male subjects, again individually photographed, while they were lying on a bed or kneeling back on the bed and thrusting their penises in a forward manner. Additionally, there were images of the penises of two naked males, photographed together, as they stood next to a bed, sat on the bed thrusting their penises in a forward manner, and knelt on all fours on the bed with their penises exposed from behind. A witness testified at trial that the bedroom depicted in the photographs was Kaufman's bedroom.

[15] In March 2014, the State filed its notice of intent to use 404(b) evidence. Specifically, the State's notice indicated that it intended to introduce evidence from various witnesses, including eighteen males whom Kaufman had asked to participate in a sexually-based study and eleven males, from the eighteen listed, who had participated in the study. The State alleged that it sought to introduce the evidence, in accordance with Evidence Rule 404(b), to prove motive, opportunity, intent, preparation, plan, identity, absence of mistake, or lack of accident. The trial court initially denied the State's 404(b) motion.

[16] During the pendency of this case, Kaufman entered into a written plea agreement in which he agreed to plead guilty to two amended charges of Class

D felony official misconduct and Class A misdemeanor false informing in exchange for the State's dismissal of the remaining charges. The trial court ultimately rejected Kaufman's plea, finding that Kaufman had failed to establish an adequate factual basis because Kaufman had stated that his request for photographs of B.D.'s penis and request to take measurements of B.D.'s penis, which would have included Kaufman physically touching his penis, were made for the study and were not made to arouse or satisfy Kaufman's sexual desires.

[17] In preparation for trial, the State filed its witness and exhibit list, which included, among its list of intended witnesses, the names of nine people who had been listed in the State's 404(b) notice. Two of these nine witnesses were C.R. ("C.R.") and K.R. ("K.R."). Among its list of intended exhibits, the State indicated that it planned to introduce into evidence the thumb drive and the nude male photographs contained thereon; the video of Kaufman's April 2013 interview with Detective Rhine-Walker; and the video of a 1995 interview that Kaufman did with an attorney. Thereafter, Kaufman filed two motions in limine, seeking to prohibit the State from offering evidence of: (1) the thumb drive containing photographs of naked adult men; and (2) witnesses contained in the State's 404(b) notice.

[18] In March 2017, the trial court held a three-day jury trial. At the time of trial, the State had amended the charging information and proceeded against Kaufman on the following three charges: (1) Class C felony attempted sexual misconduct with a minor; (2) Class D felony attempted possession of child

pornography; and (3) Class D felony child solicitation. All three of these charges involved an underlying specific intent to satisfy or arouse the sexual desires of Kaufman. *See* IND. CODE §§ 35-42-4-9 (sexual misconduct with a minor); 35-42-4-4 (possession of child pornography); 35-42-4-6 (child solicitation) (2008).[5]

[19] Before the trial commenced, the trial court and the parties discussed the State's proposed 404(b) evidence, which included: (1) C.R.'s testimony; (2) K.R.'s testimony; (3) the video of Kaufman's interview with Detective Rhine-Walker; and (4) the photographs of naked men contained on the thumb drive. They also discussed whether the evidence might be allowed under the intent and plan exceptions of Rule 404(b).

[20] The trial court, which was well-versed in the analysis and considerations of the Evidence Rule 404(b) exceptions, discussed some relevant caselaw, including *Hicks v. State*, 690 N.E.2d 215 (Ind. 1997) and *Wickizer v. State*, 626 N.E.2d 795 (Ind. 1993) and explained to the parties that the evidence would be admissible if the State met the two required considerations, as set out in *Hicks*, of relevancy

---

[5] Specifically, the attempted sexual misconduct with a minor charge alleged, in relevant part, that Kaufman, while acting with the intent to commit the crime of sexual misconduct with a minor, asked B.D. to submit to a fictional study wherein Kaufman would touch or fondle B.D.'s penis with intent to arouse or satisfy the sexual desires of Kaufman. The attempted possession of child pornography charged alleged, in relevant part, that Kaufman, with the intent to commit the crime of possession of child pornography, requested B.D. to provide photographs that depicted sexual conduct. The possession of child pornography statute defines "sexual conduct" in part, as the exhibition of uncovered genitals intended to satisfy or arouse the sexual desires of any person. *See* I.C. § 35-42-4-4. Lastly, the child solicitation charged alleged, in relevant part, that Kaufman knowingly or intentionally solicited B.D. to engage in fondling or touching to arouse or satisfy the sexual desires of Kaufman.

and then balancing the probative value against any prejudicial effect. The trial court also discussed how the facts of the case—specifically that Kaufman had asserted that he was seeking B.D.'s penis measurements and photographs on behalf of a university study—had established a contrary intent to the intent to arouse or satisfy his own sexual desires as was part of the charges against him. The trial court noted that this case was "kind of a strange case" and seemed to be an issue of "first impression." (Tr. Vol. 3 at 55). The trial court summarized the unique nature of the case and the intent and plan exception as follows:

> Here's the problem in this case. The facts as alleged are that [Kaufman] specifically used this lure. If he just said, 'Hey, let me take pictures of your penises,' and the guy said, 'no,' it's a close call. But he said, 'I'm taking a university study. You'll get paid. You can get even more if you do this.' And in the same period, he's saying the same thing to other individuals, and those individuals go through with it, and it's shown that the end result is fondling et cetera, it's plan, it's intent. I think it comes in.

> \* \* \* \* \*

> I'm trying to limit this to stuff that happened in the same time period. They have a whole slew of stuff they can ask me that I told them in advance, I'm probably not going to let them use. But once again, I'm just saying that I—because I don't have a foundation, I don't have these witnesses in front of me yet, but if [the State] can lay [its] foundation and do those things, [Kaufman] will be able to make [his] objection to preserve the record, but it is my thinking that I will probably allow in the photographs,[6] and I will probably allow in [C.R.]'s testimony,

---

[6] The trial court, however, indicated that certain photographs, including the "two-man series" of photos, would not be admissible under the exception. (Tr. Vol. 3 at 47).

and perhaps, [K.R.]'s testimony. I doubt that I'm going to let in anything older than that.

(Tr. Vol. 3 at 54-55).

[21] During the trial, B.D. testified regarding the facts surrounding Kaufman's offenses against him. B.D. also testified that he kept returning to the Fire Department because he wanted to be a fireman. He testified that he did not initially tell anyone about Kaufman's repeated requests to participate in the study because "it was weird" and "embarrassing." (Tr. Vol. 3 at 80). B.D. also testified that he was afraid that if the story got out, then Kaufman would kick him out of the cadet program and reduce the chance that B.D. would become a fireman.

[22] Prior to the State calling C.R. as a witness, the trial court held a hearing outside the presence of the jury to discuss C.R.'s potential testimony and Kaufman's 404(b) objection thereto. The State indicated that C.R.'s proposed testimony would be that Kaufman had: (1) asked C.R. to participate in a University of Michigan sex study; (2) asked C.R. sex-related questions; (3) told C.R. that the university researchers liked his questionnaire responses and wanted C.R. to be part of the study by providing penis measurements and a semen sample; (4) measured and touched C.R.'s flaccid and erect penis; (5) offered to perform fellatio to assist C.R. in making his penis erect; and (6) offered to help C.R. ejaculate to get a semen sample; and (7) obtained a semen sample from C.R., who did not use Kaufman's assistance. The State asserted that C.R.'s testimony would be admissible under Rule 404(b) because it was necessary for

the State to "show what the study actually consisted of and what actually happened as part of [the] plan, but also to show, in conjunction with other evidence, that the intent was for more than a professional or scientific study." (Tr. Vol. 3 at 128).

[23]    In response, Kaufman's counsel argued as follows:

> [T]his is a child solicitation, attempted sexual misconduct with a minor. [C.R.] was of a consenting age and an adult. The evidence thus far, in terms of our alleged victim, was -- the study consisted -- that he knew of -- consisted of the survey and photographing of [the] penis. There has been no evidence from the victim. In fact, he said he -- there might be other things down the road but he didn't know what they were.
>
> So this evidence, this 404(b) evidence, while similar in the first two steps in terms of the study and the measurements, is not similar at all in terms of the semen sample, the assistance in obtaining the semen sample. Measuring the -- or weighing the probative value versus the prejudicial effect to the defendant, allows t[he] jury to speculate. And, again, the risk of them convicting on what happened to [C.R.] versus what actually occurred in these charged acts is great. That's our objection.

(Tr. Vol. 3 at 129).

[24]    The trial court then ruled as follows:

> In doing the Hicks analysis, first we determine[] whether it's relevant to a manner other than the defendant's propensity to commit the crime. I think it's -- we talked about this yesterday. I think it's part of a plan. It's within the same time period. It's also, in this case, intent and intensively [sic] been placed into the equation because of the nature of the ruse itself is of what the

alleged ruse is. Because this is a specific intent -- these are specific intent crimes -- they must show that the attempt was to do something beyond scientific, beyond clinical. And the fact that these first two steps may be seen as part of a grooming plan that leads to -- that was meant to lead towards something else, I think is relevant. The question is is it overly prejudicial? I think it's limited to one or two within the same timeframe, fine. As I've indicated there's a slew of other witnesses listed on the State that I'm not going to allow because they are not similar and/or it's a combination of not being similar or not within the same timeframe. But I will allow [C.R.].

(Tr. Vol. 3 at 128-29). Kaufman then asked for a limiting instruction as to the limited use for the evidence for intent and plan, and the trial court agreed. When the jury returned, the trial court instructed the jury as follows:

This next witness is problematic for us in the rules of evidence so to speak. I'm going to explain that generally prior bad acts cannot be used to so that the defendant has a propensity to commit the acts charged. Therefore, you're going to here [sic] from this next witness who is going to talk about a few things. You can only use this witness's testimony to aid you in determining the -- whether the intent of the defendant or whether there was a plan that the defendant had. You can only use it for those purposes if you need to determine those in your minds. You may not use it to say this man has a propensity to do these things. It's a fine line. It's obviously an intellectual line that you're going to have to make. Does anybody have a problem with understanding that?

(Tr. Vol. 3 at 132-33). The trial court then asked Kaufman whether he had any problems with the explanation, and his counsel indicated that he did not.

[25] Thereafter, C.R. testified that in the Fall of 2008, when he was twenty years old, he took an EMT class in which Kaufman was the instructor. C.R. described how Kaufman had approached him, invited him to his house, told C.R. that he was helping to conduct a University of Michigan study, and asked C.R. if he wanted to be a part of the compensated study. After C.R. agreed, Kaufman told C.R. that the study would first involve answering a survey of questions to see if C.R. would qualify for the study. Kaufman then asked C.R. detailed questions about his sexual involvement with women, wrote C.R.'s answers on a legal pad, and told C.R. that he would submit his responses to the university. Thereafter, Kaufman told C.R. that the university considered him to be a "top candidate" for the program. (Tr. Vol. 3 at 145). He then had C.R. return to his house on two different occasions. During the first return visit, Kaufman told C.R. that he needed to get a semen sample and gave C.R. a "Tupperware cup." (Tr. Vol. 3 at 148). C.R. then went into Kaufman's bathroom, masturbated, and returned the cup to Kaufman. (Tr. Vol. 3 at 148). During the second visit to Kaufman's house, Kaufman told C.R. that the study would be finished after he obtained a measurement of the size of C.R.'s penis, both flaccid and erect. C.R. pulled down his pants, and Kaufman, bare-handed, touched C.R.'s flaccid penis and measured it with a cloth measuring tape. Kaufman then grabbed C.R.'s testicles, told C.R. that he had a "good load in there[,]" and measured his testicles. (Tr. Vol. 3 at 153). Kaufman also told C.R. not to think that "this is gay" because it was "just skin" and because Kaufman was an EMT and had "been trained to do this[.]" (Tr. Vol. 3 at 153). Kaufman then told C.R. that he needed to get an erect penis measurement and

offered to "[s]uck it off" to help "get [C.R.] hard[.]" (Tr. Vol. 3 at 152). C.R. declined Kaufman's offer, went into the bathroom, and accomplished the task by himself. Thereafter, Kaufman touched and measured C.R.'s erect penis and his testicles.

[26] Following C.R.'s testimony, the State, outside the presence of the jury, made a proffer for K.R.'s testimony. The State told the trial court that K.R. would testify that: (1) when he was eighteen years old in 2007 when Kaufman approached him to do the study; (2) he agreed to participate in the study; (3) part of the study included flaccid and erect measurements of his penis; (4) Kaufman manually stimulated K.R.'s penis to get it erect; and (5) Kaufman continued to manually stimulate K.R. to collect a sperm sample. The State argued that K.R.'s testimony was relevant to show plan and intent. Kaufman objected to K.R.'s testimony regarding a semen sample and argued that it was prejudicial.

[27] The trial court ruled that the State could introduce K.R.'s testimony but that it would be more limited than C.R.'s. The trial court stated that K.R.'s testimony, with exception of any testimony relating to a semen sample, would be admissible because it was "offered for one purpose, to show that this was the intent and that this was plan[.]" (Tr. Vol. 3 at 160). The trial court specifically explained that any semen sample testimony was not to be introduced because

the "probative value [wa]s outweighed by cumulativeness and prejudice." (Tr. Vol. 3 at 161).[7]

[28] Prior to K.R.'s testimony, the trial court again advised the jury that "the same caveats [applied] as the last witness" so that K.R.'s testimony was to be considered only for the purpose of plan and intent. (Tr. Vol. 3 at 164). Thereafter, K.R. testified while he in the cadet program at the Fire Department, Kaufman had asked him to participate in a college study "for a college out of the State of Michigan." (Tr. Vol. 3 at 171). K.R. further testified that, when he was eighteen years old, he went to Kaufman's house for a landscaping job and that Kaufman again asked him to do the study. After K.R. agreed, Kaufman asked him some questions about his sex life; measured and touched K.R.'s flaccid penis with his bare hands while K.R. was on Kaufman's bed; "jacked . . . off" K.R.'s penis "to get it hard;" and measured K.R.'s erect penis. (Tr. Vol. 3 at 176). K.R. also testified that he never signed a university form or agreement to participate in the study and that he was never contacted by anyone at a university.

[29] A representative of the University of Michigan, who oversaw the university's research regulatory and compliance oversight and the protection of human subjects, testified that the university did not have any records of Kaufman or

---

[7] The trial court told the State that "any further corroborating" evidence not related to the facts of the crimes charged, such as semen sample testimony, was not necessary and stated that "we're already tempting the Court of Appeals to throw the whole thing out anyway." (Tr. Vol. 3 at 161).

any records to indicate that Kaufman was affiliated with a research study for the university.

[30] During Detective Rhine-Walker's testimony, the State sought to introduce a redacted version of Kaufman's videotaped police interview.[8] The trial court and the parties discussed, outside the presence of the jury, the admissibility of the video and watched the redacted version. Kaufman's counsel objected based on Evidence Rule 404(b), arguing that Kaufman had "admit[ted], in general, to certain conduct over some course of time never referenced by day or person" and that his admissions "never relat[ed] to [B.D.]." (Tr. Vol. 3 at 187). Kaufman's counsel also argued that any reference to Kaufman's sex life, potential for homosexuality, allegations from the 1990's, or discussion of semen samples should not be admitted. The trial court agreed with Kaufman on this latter point and stated that it did not want "to risk the danger of the jury painting a picture that this exact same scenario took place for 25 years." (Tr. Vol. 3 at 192). The trial court explained that Kaufman's claim that he was conducting a study was the "only probative" part of the video because it went towards "intent and plan" and that the objected-to parts of the video would be exclude because it went "too much into propensity" and was outweighed by

---

[8] The State had initially sought to introduce the entire two-hour video but then redacted it after the trial court had explained the limitations regarding the admission of evidence under the Rule 404(b) exceptions.

prejudicial value. (Tr. Vol. 3 at 192). Thereafter, the trial court admitted a further redacted version of the video as State's Exhibit 1B.[9]

[31] When the State sought to admit the thumb drive (State's Exhibit 2) and nine photographs of naked men contained thereon (State's Exhibits 4-12), Kaufman objected to the photographs based on Rule 404(b) and 403.[10] Kaufman argued that the photographs, especially the ones that may have been placed on the drive in 2002, were "remote in time" and that, additionally, they were "cumulative" because the trial court had already allowed other evidence in relation to intent. (Tr. Vol. 3 at 248). Kaufman also argued that because the State would have a witness from the University of Michigan to testify that there was no study, then the photographs were not necessary and seemed to be offered only to "enflame this jury[.]" (Tr. Vol. 3 at 50). The State argued that they were seeking to admit the photographs under the 404(b) exceptions to prove, in relation to the attempted possession of child pornography charge, that the photographs were non-scientific, that Kaufman did not have the intent to do a scientific study, and that he intended to retain the photographs.

[32] The trial court agreed with Kaufman that the photographs in Exhibits 4-12 were cumulative of the evidence of intent relating to the attempted sexual misconduct with a minor and child solicitation charges. However, the trial

---

[9] The content of the video is discussed in the fact section above.

[10] The photographs that the State sought to admit was narrowed from twenty-nine to nine based on the trial court's explanation of limitations regarding the admission of evidence under the Rule 404(b) exceptions.

court noted that the thumb drive had been "possessed in an area that circumstantially could [have] be[en] [Kaufman's]" and ruled that the photographs were indicative of "intent" and "plan" and were "relevant to the [attempted] possession of child pornography" charge. (Tr. Vol. 3 at 249). The trial court stated that the photos "could clearly be probative of whether the stated reason for this quote, unquote, 'study,' was true or not[,] [a]nd the fact that they go beyond anything that could resemble any type of scientific study into more prurient—prurient photographs would be evidence of the true intent of the defendant[.]" (Tr. Vol. 3 at 47). The trial court also informed Kaufman that it would give the jury a limiting instruction that the photographs were to be used only for consideration of intent in relation to the child pornography charge. After the photographs were admitted into evidence, the trial court instructed the jury that the photographs were relevant only to and to be considered only for "the count dealing with pornography" and not the other two counts. (Tr. Vol. 4 at 11).

[33] In closing arguments, both the State and Kaufman's counsel reminded the jury that some of the evidence could be considered for a limited purpose only. More importantly, in its final jury instructions, the trial court instructed the jury as follows:

> Evidence has been introduced that the Defendant was involved in bad acts other than those charged in the information. This evidence has been received solely on the issue of Defendant's intent and plan. This evidence should be considered by you only for that limited purpose.

(App. Vol. 3 at 53).

[34] The jury found Kaufman guilty as charged. The trial court entered judgments of conviction for Class C felony attempted misconduct with a minor and Class D felony attempted possession of child pornography.[11] The trial court imposed a five (5) year sentence, with four (4) years executed and one (1) year suspended to probation, for Kaufman's Class C felony attempted misconduct with a minor conviction, and it imposed a concurrent six (6) month sentence for his Class D felony attempted possession of child pornography conviction. Kaufman now appeals.

## Decision

[35] Kaufman argues that the trial court abused its discretion by admitting: (1) C.R.'s testimony; (2) K.R.'s testimony; (3) State's Exhibit 1B, the video of his police interview; and (4) State's Exhibits 4-12, the photographs of naked men. Specifically, he contends that the evidence was inadmissible under the intent

---

[11] The record before us contains conflicting information about the Class D felony child solicitation verdict. The chronological case summary indicates that the trial court "accept[ed] the verdicts of the Jury and enter[ed] judgment[s] accordin[g]ly." (App. Vol. 2 at 13). The trial court's sentencing order does not contain any indication that a judgment of conviction or a sentence was entered upon the Class D felony child solicitation verdict. The amended abstract of judgment indicates that Class D felony child solicitation charge was dismissed.

and plan exceptions of Indiana Evidence Rule 404(b) and under Evidence Rule 403 because it was unfairly prejudicial.[12]

[36] The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for an abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Conley v. State*, 972 N.E.2d 864, 871 (Ind. 2012), *reh'g denied*.

[37] Indiana Evidence Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Ind. Evid. Rule 404(b)(1). However, such evidence may be admitted to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid. R. 404(b)(2). Evidence "Rule 404(b) is designed to prevent the jury from making the forbidden inference that prior wrongful conduct suggests present guilt." *Halliburton v. State*, 1 N.E.3d 670, 681 (Ind. 2013) (citation and internal quotation marks omitted). *See also Hicks*, 690 N.E.2d at 218 (explaining that Evidence Rule 404(b) is "designed to prevent the jury from assessing a defendant's present guilt on the basis of his past

---

[12] Kaufman also argues that the trial court should have excluded State's Exhibits 4-12 based on a lack of foundation. We acknowledge that the record shows that the State laid the foundation in a rather piecemeal fashion; however, we find his argument without merit.

propensities"). When determining whether to admit evidence of specific acts under Rule 404(b), the trial court is required to: (1) determine whether the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act;[13] and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Indiana Evidence Rule 403.[14] *Hicks*, 690 N.E.2d at 221.

[38] Here, the trial court admitted the challenged evidence under the intent and/or plan exceptions of Evidence Rule 404(b). We choose to focus our analysis on the intent exception. *See Cannon v. State*, 99 N.E.3d 274, 278 (Ind. Ct. App. 2018) (explaining that our Court "may affirm the trial court's ruling if it is sustainable on any legal basis in the record, even thought it was not the reason enunciated by the trial court"), *trans. denied*. Our supreme court has explained that the intent exception in Evidence Rule 404(b) is to be narrowly construed and "will be available when a defendant goes beyond merely denying the charged culpability and affirmatively presents a claim of particular contrary intent." *Wickizer*, 626 N.E.2d at 799. When determining whether a defendant has raised a contrary intent, our appellate courts have considered a defendant's pretrial statement to police, opening statement, cross-examination of the State's

---

[13] "When inquiring into relevance, the court may consider any factor it would ordinarily consider under Rule 402." *Hicks*, 690 N.E.2d at 221. These factors may include "the similarity and proximity in time of the prior bad act to the charged conduct[] and will presumably typically include tying the act to the defendant." *Id.*

[14] Evidence Rule 403 provides that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."

witnesses, or evidence in the defendant's case-in-chief. *See id.* (setting forth in-trial examples of ways a defendant could raise a contrary intent); 12 Robert L. Miller, Indiana Practice, *Indiana Evidence*, § 404.214 (4th ed.) (discussing consideration of a defendant's pretrial police statements when considering a defendant's contrary intent); *Whitehair v. State*, 654 N.E.2d 296, 302 n.2 (Ind. Ct. App. 1995) (noting that, although the *Wickizer* court set forth in-trial examples of assertions of contrary intent, it also took into consideration the defendant's pretrial responses to police questions). The State may respond to the defendant's contrary intent "by offering evidence of prior crimes, wrongs, or acts to the extent genuinely relevant to prove the defendant's intent at the time of the charged offense." *Wickizer*, 626 N.E.2d at 799. Thereafter, the trial court will balance the probative value of the evidence against its prejudicial effect pursuant to Indiana Evidence Rule 403. *Id.*

[39] Here, as noted by the trial court, Kaufman's contrary intent was advanced by the unique nature of the facts of this case. Specifically, the facts reveal that Kaufman had told B.D. that he was seeking B.D.'s penis measurements and photographs on behalf of a university study, which constitutes a contrary intent to the intent to arouse or satisfy his own sexual desires as was part of the charges against him. Additionally, Kaufman asserted a contrary intent in his interview with Detective Rhine-Walker.[15] During the interview, Kaufman was

---

[15] We reject Kaufman's challenges to the admissibility of the video of his police interview. The trial court had the state substantially redact the video and limited what portion was admitted into evidence. We agree with the trial court that it was probative of Kaufman's intent, and we conclude that Kaufman has made no

resolute in his assertion that he was part of a university study that sought sexual lifestyle information and penis measurements. Kaufman insisted that during the study he never did anything of a "sexual nature" and that everything he did was for "information and research." (State's Ex. 1B). Based on Kaufman's assertion of contrary intent, the trial court allowed the State to respond by offering its challenged evidence that was relevant to proving defendant's intent at the time of the charged offenses. We conclude there was no abuse of discretion in the trial court's determination. *See Wickizer*, 626 N.E.2d at 799 (explaining that the State may respond to the defendant's contrary intent "by offering evidence of prior crimes, wrongs, or acts to the extent genuinely relevant to prove the defendant's intent at the time of the charged offense").

[40] In balancing the probative value of the evidence against its prejudicial effect under Rule 403, we note that "[a]ll evidence that is relevant to a criminal prosecution is inherently prejudicial; thus[,] [the] proper inquiry under Evidence Rule 403 boils down to a balance of the probative value of the proffered evidence against the likely unfair prejudicial impact of that evidence." *Fuentes v. State*, 10 N.E.3d 68, 73 (Ind. Ct. App. 2014), *trans. denied*. "When determining the likely unfair prejudicial impact, courts will look for the dangers

---

cogent argument to show how the probative value was outweighed by any prejudicial effect, especially where he asserts that his statements during the interview described "legal acts between consenting adults" and where he acknowledges that he did not make any admissions relating to his alleged offenses against B.D. (Kaufman's Br. 21).

that the jury will substantially overestimate the value of the evidence or that the evidence will arouse or inflame the passions or sympathies of the jury." *Id.*

[41] Here, the trial court carefully considered and limited the State's evidence that was relevant to showing Kaufman's intent. The trial court recognized the potential for prejudice and tempered it by instructing the jury as to the limited nature of the challenged evidence when it was introduced at trial. Specifically, the trial court instructed the jury that C.R.'s and K.R.'s testimony was to be used only to determine Kaufman's intent in regard to the attempted sexual misconduct with a minor and child solicitation charges and that the photographs were to be so considered for the attempted possession of child pornography charge. During closing arguments, the State and Kaufman's counsel reminded the jury of the limited purpose for the challenged evidence. Additionally, the trial court gave a final jury instruction regarding the limited purpose for the evidence and expressly stated that it was to be considered only for intent and plan. "When limiting instructions are given that certain evidence be considered for only a particular purpose, the law will presume that the jury will follow the court's admonitions." *Hernandez v. State*, 785 N.E.2d 294, 303 (Ind. Ct. App. 2003), *trans. denied*. *See also Scalissi v. State*, 759 N.E.2d 618, 623 (Ind. 2001) (explaining that "when a jury is properly instructed by the trial court, the jury is presumed to have followed such instructions"). Given the "safeguards" set in place by the trial court to ensure that the jury did not make a forbidden inference that Kaufman's prior conduct suggested present guilt, we conclude that trial court did not abuse its discretion by admitting the challenged

evidence under the intent exception of Evidence Rule 404(b). *See Monegan v. State*, 721 N.E.2d 243, 249 (Ind. 1999) (affirming the trial court's admission of evidence under the intent exception of Rule 404(b) and explaining that the trial court's admonition and instruction—that the jury was to consider evidence of the defendant's previous act of murder only for the purpose of establishing the defendant's intent—were "safeguards" and were "sufficient to prevent the jury from drawing the 'forbidden inference' that the prior wrongful conduct suggests present guilt").

[42]    Affirmed.

Vaidik, C.J., and Barnes, Sr.J., concur.